# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| _____ ) | |
| FEDERAL ELECTION COMMISSION, ) | |
| ) | No. 15-cv-00017-LPS |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | BRIEF IN SUPPORT OF |
| CHRISTINE O'DONNELL, *et al.*, ) | MOTION FOR SUMMARY |
| ) | JUDGMENT |
| Defendants. ) | |
| _____ ) | |

## REPLY BRIEF IN SUPPORT OF
## PLAINTIFF FEDERAL ELECTION COMMISSION'S
## MOTION FOR SUMMARY JUDGMENT AND
## OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Daniel A. Petalas
Acting General Counsel
dpetalas@fec.gov

Lisa J. Stevenson
Deputy General Counsel – Law
lstevenson@fec.gov

Kevin Deeley
Acting Associate General Counsel
kdeeley@fec.gov

Harry J. Summers
Assistant General Counsel
hsummers@fec.gov

Robert W. Bonham III
Senior Attorney
rbonham@fec.gov

Seth Nesin
Attorney
snesin@fec.gov

FOR THE PLAINTIFF
FEDERAL ELECTION COMMISSION
999 E Street NW
Washington, DC 20463
(202) 694-1650

April 13, 2016

# TABLE OF CONTENTS

**Page**

I.      CHRISTINE O'DONNELL RESIDED AT HER CAMPAIGN
        HEADQUARTERS, FOR WHICH THE CAMPAIGN PAID RENT
        AND UTILITIES .......................................................................................................2

II.     THE *PER SE* RULE PROHIBITING THE USE OF CAMPAIGN FUNDS
        FOR MORTGAGE, RENT AND UTILITIES APPLIES TO THE
        TOWNHOUSE ........................................................................................................6

III.    PROHIBITING THE USE OF CAMPAIGN FUNDS FOR PERSONAL
        MORTGAGE, RENT, AND UTILITY PAYMENTS IS CONSTITUTIONAL ..........9

IV.     DEFENDANTS HAVE WAIVED ARGUMENTS AS TO THE MERITS
        AND REMEDIES BY FAILING TO INCLUDE THEM IN THEIR
        OPENING/OPPOSING BRIEF ................................................................................12

V.      EVEN IF DEFENDANTS HAVE NOT WAIVED THE CLAIM THAT THEY
        ACTED IN GOOD FAITH FOR PURPOSES OF ASSESSING A CIVIL
        PENALTY, THE RECORD HERE SHOWS A LACK OF GOOD FAITH...............13

CONCLUSION.....................................................................................................................16

# TABLE OF AUTHORITIES

*Cases*

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*,
    554 F. Supp. 2d 538 (D. Del. 2008)............................................................................12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................................................6

*Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162 (7th Cir. 1996) .....................6

*Broadrick v. Oklahoma,* 413 U.S. 601 (1973) ..........................................................................11

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...................................................................................10, 11

*Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156 (9th Cir. 1992) ...............................................14

*Drumgo v. Burris*, No. 12-1204-GMS, 2015 WL 4591957 (D. Del. July 29, 2015)................6

*FEC v. Craig for U.S. Senate*, __ F.3d. __, No. 14-5297, 2016 WL 850823
    (D.C. Cir. Mar. 4, 2016) ....................................................................................................9

*Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247 (3d Cir. 2007) ...........................................6

*McConnell v. FEC*, 540 U.S. 93 (2003)...................................................................................10

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994) .........................14

*Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984) ................6

*Statutes and Regulations*

52 U.S.C. § 30108(b) .................................................................................................................12

52 U.S.C. § 30111(e) .................................................................................................................12

52 U.S.C. § 30114(b) ...........................................................................................................1, 2, 7

52 U.S.C. § 30114(b)(2)(A) .........................................................................................................5

11 C.F.R. § 113.1(g)(1)(i) ............................................................................................................8

11 C.F.R. § 113.1(g)(1)(ii) ...........................................................................................................8

11 C.F.R. § 113.1(g)(1)(i)(E) ...............................................................................................7, 10

11 C.F.R. § 113.1(g)(1)(i)(E)(1) .........................................................................5, 7

11 C.F.R. § 113.1(g)(1)(i)(E)(2) .........................................................................7

11 C.F.R. § 113.1(g)(1)(ii) ..................................................................................

***Miscellaneous***

D. Del. L. R. 7.1.3(c)(2)......................................................................................12

*Expenditures; Reports by Political Committees; Personal Use of Campaign Funds*,
    60 Fed. Reg. 7862 (Feb. 9, 1995) ....................................................... 8, 10-11

FEC Advisory Op. 2001-09 (Kerrey for U.S. Senate)................................................9

FEC Advisory Op. 2009-08 (Gallegly for Congress) ..............................................9

FEC Advisory Op. 2011-05 (Terry for Congress) ...................................................9

FEC Advisory Op. 2011-17 (Giffords for Congress), ..............................................9

The record in this case abundantly demonstrates that Christine O'Donnell and her campaign committee violated 52 U.S.C. § 30114(b) by using campaign funds to pay for rent and utilities at O'Donnell's residence during her campaign for U.S. Senate in 2010.  Defendants' opposition to the opening brief of the Federal Election Commission ("Commission" or "FEC") argues for the first time that the property was not O'Donnell's actual residence — even though she admitted residing there many times during the FEC administrative proceedings and in discovery in this case — on the grounds that she allegedly did not sleep there often enough.  This last-minute claim is contrary to her earlier sworn testimony and much of the other evidence in the record, and it also shows why the FEC's *per se* ban on these arrangements reasonably avoids such potentially sensitive inquiries.

Defendants also wildly misinterpret the FEC regulation that makes it a *per se* violation to use campaign funds to pay rent or utilities on a candidate's residence, claiming that the rule applies only to properties the candidate or her family *owns*.  But defendants can only propose that nonsensical reading by trying to hide a key part of the statute and regulation behind ellipses.

Defendants' additional claim that O'Donnell's rent and utility costs would not have existed irrespective of the campaign is also baseless.  Even if her campaign led to legitimate security concerns about making her address known to the public, as defendants now contend was the sole reason for O'Donnell's use of the Townhouse as a residence, those concerns did not require that campaign funds pay for housing costs, or electric and cable services, in violation of the law.  Defendants' arguments that the personal use ban is unconstitutional, including their claim that the ban is actually an expenditure limit, are equally meritless.

Defendants have also waived many of their prior arguments, including their affirmative defense that their conduct fell within a safe harbor related to FEC regulations, by failing to make them in their opening/opposing brief.  They make only a passing reference to their contention that they acted in good faith.  To the extent that cursory mention was sufficient to preserve their arguments regarding good faith, the Court should find those arguments unavailing because defendants were on notice that their activities might be deemed illegal nearly from the beginning.

1

Indeed, defendants' specific assertions as to their supposed reliance on advice from the FEC or counsel actually indicate a lack of good faith.

In sum, despite defendants' diversionary tactics, it is clear that O'Donnell resided at her campaign headquarters and that campaign funds were used for the rent and utility payments in *per se* violation of 52 U.S.C. § 30114(b) and governing regulations.  The Court should grant summary judgment to the FEC and order civil penalties, disgorgement, and injunctive relief.

## I.      CHRISTINE O'DONNELL RESIDED AT HER CAMPAIGN HEADQUARTERS, FOR WHICH THE CAMPAIGN PAID RENT AND UTILITIES

Despite her new claims to the contrary, there is overwhelming evidence that Christine O'Donnell resided at her campaign headquarters in Greenville ("the Townhouse") in 2010 and 2011.  When the 2010 administrative complaint that led to this lawsuit was filed with the FEC, O'Donnell submitted a sworn affidavit to the Commission stating that "several campaign staff members and I moved into the townhouse and lived above the office in the upstairs floors of the townhouse."  (*See* Aff. of Christine O'Donnell (Dec. 2, 2010) (2010 O'Donnell Aff.") ¶ 8, FEC Exh. 2; *id.* ¶ 10 ("I personally paid for my pro-rata share of the rental payments to cover my living costs at the campaign's premises"); *id.* ¶ 11 ("I paid for my share of the costs of the living space.").)

The response to the administrative complaint O'Donnell and Friends of Christine O'Donnell ("the Committee") provided to the FEC reiterated the point.  (*See* Resp. to Compl. and Mot. to Dismiss, MUR 6380 (Dec. 2, 2010) at 2, FEC Exh. 1 ("[O'Donnell] and other campaign workers live(d) at the townhouse on the floors above the campaign offices.").)  They argued that there was no illegal conduct because "Christine O'Donnell made payments to the campaign for her pro-rate [sic] share of the costs of her living quarters," and they attached documentation of "payments by Christine O'Donnell to the campaign for her pro-rata share of the rent for her living space."  (*Id.*)  They noted that "[t]he premises were leased by the campaign and were used for both the campaign offices and living quarters for campaign staff workers and Christine O'Donnell, who paid the campaign for the costs of her personal living space."  (*Id.*)

2

When defendants supplemented their response eight months later, they continued to take the position that O'Donnell had actually lived at the Townhouse, explaining that the Townhouse "served as the campaign headquarters and provided space upstairs where various campaign workers and Ms. O'Donnell resided." (*See* Resp'ts Suppl. Resp. to Compl. Filed by CREW against Christine O'Donnell and Friends of Christine O'Donnell, MUR 6380 (July 22, 2011) at 3, FEC Exh. 3 ("Christine O'Donnell paid rent from her personal account to the campaign for her *pro-rata* share of the premises used by her for living space . . . .").) At no time during the administrative proceedings did Christine O'Donnell or the Committee take their current position that O'Donnell merely used the Townhouse as a sham address to fool the public about where she physically lived due to her alleged security concerns.

Similarly, in their initial disclosures in this case, the defendants indicated that Christine O'Donnell could provide information about, among other items, "the allocation of living space and utilities used by Ms. O'Donnell as opposed to the space used by the Campaign Committee; the purposes for which the space was used." (Defs.' Initial Disclosure Under Fed. R. Civ. P. 26(a)(1) (Sept. 14, 2015) at 1, FEC Exh. 5.) In response to the FEC's discovery requests, defendants admitted that Christine O'Donnell "resided at the townhouse beginning in January 2010." (Defs.' Suppl. Resps. to FEC's First Set of Interrogs. and Admis. Reqs. ("Resp. to Disc.") Interrog. 6, FEC Exh. 6.) And a 2012 report that O'Donnell made to the police — about an incident that occurred at the Townhouse from "9/1/2010" to "02/01/2012" — listed her residence at the Townhouse as "Full Time." (Initial Crime Report, (Apr. 10, 2012), FEC Exh. 4.)

At O'Donnell's February 2016 deposition, she testified that she "slept in a lot of different places depending on where we ended up and depending on who was doing what else in the campaign." (Deposition of Christine O'Donnell ("O'Donnell Dep.") at 163, FEC Exh. 7.) However, she continued to acknowledge that she used the Townhouse as a residence — she admitted that she "slept there on occasion" (*id.* at 96) and that she might have slept there as much as "50/50" (*id.* at 37). At the Townhouse, she kept "makeup and a spare set of clothes and stuff

3

like that" (*id.* at 123) in a master bedroom and bathroom that were, at least initially, "exclusively

for [O'Donnell's] use" (*id.* at 121).  Furthermore, when asked about the precise extent of her use

of the Townhouse, O'Donnell responded that such questions were "irrelevant" because she had

already "conceded" that the property was her legal residence.  (*See, e.g.*, *id.* at 26-27 ("[A]s I've

already conceded, it was listed as my legal residency . . . ."); *id.* at 36 ("I think we've conceded –

I mean, for all intents and purposes, whether I stayed there every single night or whether I stayed

there one night, it was my legal residence and we're not challenging that."); *id.* at 96 ("But,

again, I have conceded to it be being my residence.  You know what I mean?  It's on my driver's

license.  I could [have] slept on an air mattress.  The fact that I had a bed -- you know, like it was

my residence.  So I'm not challenging that."); *id.* at 123-24 ("Well, again, this was my legal

residency.  So I'm not contesting that this is my legal residency.  So to the relevance that -- I

mean, I'm not trying to say that I didn't sleep there.").)  Following is a typical exchange:

> Q. How often, in your judgement [sic], did you stay over at the townhouse?
>
> A. I don't even know.
>
> Q. Is there any way that you can estimate?
>
> A. I mean, unless it's going to -- again, I don't want anything to come back and bite me.  I could say 50/50. I have no idea. I would have to go back and look at the calendar.  And if it's that crucial, I mean –
>
> Q. But without getting into any kind of exact number, would you describe your use of the townhouse as a living space as [an] infrequent occurrence or a regular occurrence or –
>
> A. Well, because it was where I voted, it was the address on my driver's license and it was a regular space.
>
> Q. Right.  What I'm asking though is your actual use of that space.
>
> A. Right.  I don't understand. I mean, I don't understand the question.  I don't understand. . . . I don't understand.  Short of me getting out the calendar, you know, if I put a number out there and I'm slightly off, it's going to come back to bite me.  So I've conceded a hundred percent it's

4

> my legal residency.  I don't understand how where I laid my head is an
> issue.

(*Id.* at 36-38.)

But now, after discovery has closed, apparently it is an issue.  Defendants now take the position that the Townhouse was merely a "legal residence" and argue that it therefore should not be subject to the statutory *per se* prohibition on campaign funds used for mortgage, rent or utilities.  (*See, e.g.*, Br. in Supp. of Defs.' Mot. for Summ. J. and in Answer to FEC's Mot. for Summ. J. ("Defs.' Br.") (D.I. 59) at 1, 2, 5-8, 10, 12, 15-17.)  Defendants claim that O'Donnell "swore, in this lawsuit, consistently, that she *never* lived there."  (*Id.* at 17.)  But the evidence above shows otherwise.  Defendants also suggest that because O'Donnell was merely using a fake address to hide where she really lived, she "was not under any obligation to make any sublease payments *at all*."  (*Id.* at 15.)  Yet O'Donnell made five separate payments to her campaign committee, over the course of almost an entire year, to reimburse for rent and utilities, based upon a formula in which her share depended upon the square footage of a room that she now claims not to have even used.  And these payments continued even after the campaign hired a "blue chip" attorney "to mak[e] sure everything we did was in compliance."  (O'Donnell Dep. at 85, 87.)  It is difficult to avoid the conclusion that O'Donnell's admissions that the Townhouse was her "legal residence" were litigation tactics to prevent the FEC from obtaining information about the very subject that the defendants now claim is critical to the case — "the place she laid her head."  (Defs.' Br. at 2, 5, 12, 16.)  The Court should not reward this sort of gamesmanship.

In any case, defendants' distinction between a "legal residence" and an actual residence has no basis in the law relevant to personal use of campaign funds; the defendants appear to have simply made it up for the purposes of this litigation.  The personal use statute prohibits using campaign funds for a candidate's "home mortgage, rent, or utility payment."  52 U.S.C. § 30114(b)(2)(A).  The FEC's regulation states that the *per se* prohibition extends to "any part of *any* personal residence of the candidate or a member of the candidate's family."  11 C.F.R. § 113.1(g)(1)(i)(E)(1) (emphasis added).

Defendants cannot avoid summary judgment by offering conflicting testimony over time to generate purported factual disputes.  (*See* Opening Br. in Supp. of Pl. FEC's Mot. for Summ. J. ("FEC Br.") (D.I. 54) at 15 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986), *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1172 (7th Cir. 1996), and *Drumgo v. Burris*, No. 12-1204-GMS, 2015 WL 4591957, at *5 (D. Del. July 29, 2015)).)  The Commission pointed this out in connection with the discrepancies between O'Donnell's December 10, 2010 affidavit and new allegations of a purported FEC telephone call in her deposition testimony; defendants made no response.  The sworn statements in O'Donnell's new affidavit that the Townhouse was only a "public residence" and "not a place I would most frequently rest my head to sleep" (*see* Aff. of Christine O'Donnell ¶ 14 (Feb. 23, 2016), FEC Exh. 8) are similarly inconsistent with her earlier affidavit and thus fail to create a genuine issue. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 254 (3d Cir. 2007) ("When a party does not explain the contradiction between a subsequent affidavit and a prior deposition, it is appropriate for the district court to disregard the subsequent affidavit and the alleged factual issue in dispute as a 'sham,' therefore not creating an impediment to a grant of summary judgment based on the deposition."); *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.")  Because defendants have already admitted over a course of years that O'Donnell resided at the Townhouse, and the record shows that O'Donnell actually did use the Townhouse as a living space, the Court should find that defendants' belated attempt to change their story fails to controvert the Commission's statement of facts.

## II.      THE *PER SE* RULE PROHIBITING THE USE OF CAMPAIGN FUNDS FOR MORTGAGE, RENT AND UTILITIES APPLIES TO THE TOWNHOUSE

As explained in the FEC's opening brief, both FECA and the Commission's regulations have a *per se* prohibition on the use of campaign funds to pay for "a home mortgage, rent, or

6

utility payment" at a candidate's residence.  (*See* FEC Br. at 8 (quoting 52 U.S.C. § 30114(b)).)
Nonetheless, defendants argue that this *per se* rule only applies to property *owned* by a candidate
or her family, relying upon selective quotations of the regulatory language that carefully omit the
part refuting their position as well as an out-of-context excerpt from the FEC's Explanation and
Justification.  (Defs.' Br. at 12-15.)  Their position misrepresents the law.

The Commission's regulation has two different subsections defining when mortgage, rent
and utility payments by a campaign constitute a *per se* personal use violation.  *See* 11 C.F.R. §
113.1(g)(1)(i)(E).  The first subsection applies to this case.  It prohibits such payments "[f]or any
part of any personal residence of the candidate or a member of the candidate's family."  11
C.F.R. § 113.1(g)(1)(i)(E)(1).  That subsection makes no mention of ownership, and the fact that
it applies to rent makes evident that it applies to personal residences generally, because
individuals do not pay rent on property that they own.

The regulation also has a second subsection, not applicable to this case, covering
mortgage, rent and utility payments "[f]or real or personal property that is owned by the
candidate or a member of the candidate's family."  11 C.F.R. § 113.1(g)(1)(i)(E)(2).  While the
first subsection involves only a "personal residence," the second subsection applies more broadly
to any "real or personal property."  11 C.F.R. § 113.1(g)(1)(i)(E).  The first subsection is a
complete prohibition on the use of campaign funds for a candidate's mortgage, rent or utilities;
the second subsection merely prohibits "payments [that] exceed the fair market value of the
property usage."  *Id.*

Defendants repeatedly quote 11 C.F.R. § 113.1(g)(1)(i)(E).  (Defs.' Br. at 13, 14, 18.)
But they consistently omit the first subsection — which plainly governs the payment of a
candidate's rent and utilities at a residence owned by a third party landlord, as occurred in this
case — giving the impression that only the second subsection exists, or at any rate that only the
second one applies here.

Defendants attempt to support their argument with a selective quotation from the
Explanation and Justification the Commission issued when promulgating these regulations, but

the unedited explanation makes clear that defendants' interpretation is wrong.  The Explanation and Justification first explains that prior to 1995 "the Commission . . . generally allowed campaigns to rent property owned by the candidate or a family member for use in the campaign, so long as the campaign did not pay rent in excess of the usual and normal charge for the kind of property being rented."  *Expenditures; Reports by Political Committees; Personal Use of Campaign Funds*, 60 Fed. Reg. 7862, 7865 (Feb. 9, 1995) ("Explanation and Justification").  The Explanation and Justification then states that the new rule, promulgated in 1995, "changes the Commission's policy with regard to rental of all or part of a candidate or family member's personal residence.  Under paragraph (g)(1)(i)(E)(1), the use of campaign funds for mortgage, rent or utility payments on any part of a personal residence of the candidate or a member of the candidate's family is personal use, even if part of the personal residence is being used in the campaign."  *Id.*

"In contrast," the Explanation and Justification goes on to explain, "paragraph (g)(1)(i)(E)(2) continues the Commission's current policy in situations where the property being rented is not part of a personal residence of the candidate or a member of the candidate's family.  Thus, a campaign committee can continue to rent part of an office building owned by the candidate for use in the campaign, so long as the committee pays no more than fair market value for the property usage."  *Id.*  Defendants selectively quote sentences from this portion of the Explanation and Justification out of context, attempting to convert the FEC's explanation of how the rules work for the specific situation where a candidate or her family owns the property into a complete statement of what the personal use ban covers.  (Defs.' Br. at 12-15.)  The general rule contains no such limit.

Because the use of campaign funds for payments of rent and utilities on Christine O'Donnell's residence falls under the *per se* prohibition in 11 C.F.R. § 113.1(g)(1)(i), defendants' arguments that the use of these funds does not trigger the "irrespective" test in 11 C.F.R. § 113.1(g)(1)(ii) are unavailing.  For the same reason, the defendants' citation to an FEC advisory opinion is inapplicable because that matter involved the "irrespective" test and was not

8

about a *per se* violation like this case.  (*See* Defs.' Br. at 18 (citing FEC Advisory Op. 2001-09 (Kerrey for U.S. Senate), http://saos.fec.gov/aodocs/2001-09.pdf).)

But even if the "irrespective" test did apply, defendants' spending here would still have been personal use.  If O'Donnell had legitimate security concerns because of her political status, she might have been able to show that campaign spending on a security system or security personnel based on such concerns was not personal use.  In fact, the FEC has approved requests on multiple occasions for candidates and officeholders to use campaign funds to pay for enhanced security at their homes.  *See* FEC Advisory Op. 2011-17 (Giffords for Congress), http://saos.fec.gov/aodocs/AO%202011-17.pdf (permitting the use of campaign funds to pay for enhanced security at the home of a member of Congress); FEC Advisory Op. 2011-05 (Terry for Congress), http://saos.fec.gov/aodocs/AO%202011-05.pdf (same); FEC Advisory Op. 2009-08 (Gallegly for Congress), http://saos.fec.gov/aodocs/AO%202009-08.pdf (same).  But such concerns plainly did not cause O'Donnell to need to pay rent or utilities.  She has not shown and cannot show that such concerns would justify having the campaign pay her basic living expenses.  And the fact that a candidate might not have been motivated to violate the personal use ban if she were merely a private citizen is no defense on the merits.  *See FEC v. Craig for U.S. Senate*, No. 14-5297, 2016 WL 850823, at *12 (D.C. Cir. Mar. 4, 2016) (rejecting argument that Senator's use of campaign funds for legal expenses related to an attempt to withdraw a guilty plea should be permitted because he would not have attempted to withdraw that plea were he not an officeholder).

The law prohibits using campaign funds for rent and utilities on a candidate's personal residence.  The Townhouse was O'Donnell's personal residence and the rent and utilities were paid primarily from campaign funds.  Defendants violated FECA's personal use ban.

## III.    PROHIBITING THE USE OF CAMPAIGN FUNDS FOR PERSONAL MORTGAGE, RENT, AND UTILITY PAYMENTS IS CONSTITUTIONAL

Defendants also argue that the FEC regulation governing the use of campaign funds for a candidate's rent and utilities is unconstitutional.  Though these arguments are addressed at

greater length in the briefs accompanying the Commission's motion to dismiss defendants' counterclaims (Opening Br. in Supp. of Pl. FEC's Mot. to Dismiss Countercls. ("MTD Br.") at 15-20 (D.I. 14); Reply Br. in Supp. of Pl. FEC's Mot. to Dismiss Countercls. ("MTD Reply") at 4-10 (D.I. 19)) the Commission addresses each briefly here.

Defendants first argue that the personal use prohibition is unconstitutional because it "frustrate[s] Ms. O'Donnell's right to commit personal resources towards a candidacy for federal office." (Defs.' Br. at 18.) But FECA and the Commission's regulation do not prohibit a candidate from giving anything to her campaign; they prohibit a campaign from giving things to the candidate. These restrictions did not frustrate Christine O'Donnell's ability to use her personal resources in the campaign.

Defendants argue that the personal use ban is an unconstitutional expenditure prohibition that should be reviewed under strict scrutiny (Defs.' Br. at 18), but that claim is also meritless. (*See* MTD Br. at 10-14; MTD Reply at 2-4.) "[E]xpenditure limitations" are restrictions on the "amount of money a person or group can spend on political communication during a campaign." *Buckley v. Valeo*, 424 U.S. 1, 19 (1976). The personal use restriction at 11 C.F.R. § 113.1(g)(1)(i)(E) is not such an expenditure limit because it does not limit the amount of money a campaign can spend, nor does it infringe on "political communication" or any other fundamental right. Defendants do not explain why spending campaign funds for personal uses would constitute a "fundamental right." And defendants ignore the functional analysis used in *McConnell v. FEC*, 540 U.S. 93, 138-39 (2003), to determine whether a campaign finance regulation constitutes a spending limit subject to strict scrutiny. The use restriction at issue here is reviewed under rational basis scrutiny. (*See* MTD Br. at 10-14; MTD Reply at 2-4.)

Defendants also assert that the *per se* prohibitions are unconstitutional because they are motivated by mere "administrative efficiency" (Defs.' Br. at 19), but that claim likewise misses the mark. (*See* MTD Br. at 16; MTD Reply at 7-10.) As noted in the Explanation and Justification, the clear line drawn by the *per se* regulation for rent and utility payments "avoids the need to allocate expenses associated with the residence between campaign and personal use."

10

Explanation and Justification at 7865.  The rule is intended to avoid FEC investigations into whether campaigns have properly allocated expenses between personal and campaign-related activities.  *Id.* at 7864 (noting that if the regulations did not include a list of *per se* violations, "the Commission would have to examine the facts and circumstances of each situation" and "more Commission involvement in the resolution of personal use issues" would be required).  This kind of prophylactic rule is not unconstitutional merely because the specific problem it addresses is not directly presented in every situation.  *See Buckley*, 424 U.S. 1, 29-30 (1976) (upholding contribution limits even though "most large contributors do not seek improper influence over a candidate's position or an officeholder's action").

Cases like this one illustrate the benefits of a *per se* rule and how a rule like the one defendants propose could create constitutional and other problems.  Defendants have argued in their brief that the value of what Christine O'Donnell received from the campaign should be judged based upon the frequency with which she slept at the Townhouse.  (*See* Defs.' Br. at 8, 16-18 (arguing that O'Donnell "rarely" slept at the Townhouse and that she only used the address to cause the public to wrongly believe that she lived there, so she derived no personal benefit).)  Adopting defendants' proposed rule would require the FEC to engage in the very sort of investigations that O'Donnell has objected to in this case as personally invasive.  And the FEC might be required to engage in these investigations even in situations where a candidate acknowledged residency, because it could be impossible to judge the amount of personal benefit without doing so.  A flat prohibition on using campaign funds for personal residences creates fewer concerns than a rule whose application may implicate a candidate's privacy interests.

Lastly, defendants argue that, pursuant to *Broadrick v. Oklahoma,* 413 U.S. 601, 612 (1973)), O'Donnell has standing "to press the claim of property owners who may want to finance a campaign to Federal office by deploying real assets."  But as stated earlier, there is no claim for her to "press" because the regulation does not prohibit a candidate from giving anything to her campaign; it only prohibits a campaign from giving things to the candidate.  (*See* MTD Reply at 10.)

11

## IV.   DEFENDANTS HAVE WAIVED ARGUMENTS AS TO THE MERITS AND REMEDIES BY FAILING TO INCLUDE THEM IN THEIR OPENING/OPPOSING BRIEF

A party waives the right to make any argument that is not contained in her opening brief. *See* D. Del. L. R. 7.1.3(c)(2) ("The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief."); *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 562 n.168 (D. Del. 2008) (refusing to consider argument "[b]ecause defendants failed to raise this argument in their opening brief, thereby giving the Committee the opportunity to respond in its opposition brief").

Defendants have now waived several arguments upon which they previously relied, both as to the merits and as to the remedies appropriate in this case.  On the merits, although the defendants' answer contained an affirmative defense alleging reliance on FEC regulations pursuant to the "[s]afe [h]arbor" provision of 52 U.S.C. § 30111(e) (*see* Defs.' Answer and Countercls. ¶ 34 (D.I. 9)), there is no mention of this argument in their initial summary judgment brief filed in support of their motion and in opposition to the Commission's.  The argument has therefore been waived.  Similarly, defendants have waived any argument that they are not liable due to Christine O'Donnell's alleged phone conversations with FEC reports analyst Vicki Davis, or due to any advice they may have allegedly received from attorneys.  They make only a glancing reference to those points (Defs.' Br. at 20) and fail to argue that such advice is not just relevant to the amount of the appropriate civil penalty, but actually excuses them from liability. This failure is particularly telling in the face of the Commission's detailed showing in its Opening Brief that such advice could not excuse or authorize defendants' illegal conduct on the merits, including because the federal government may not be estopped, government records receive a presumption of regularity and good faith, and FECA prohibits reliance on "opinion[s] of an advisory nature" from FEC employees outside the agency's formal advisory opinion process.  *See* FEC Br. at 13-16; 52 U.S.C. § 30108(b).  Defendants have not responded to any of these points.

With regard to remedies, the FEC's brief detailed the amount in violation and penalties appropriate for this case, but defendants make no argument on the subject of remedies, with the possible exception of their single paragraph generically asserting that they acted in good faith. (*Compare* FEC Br. at 16-20 (arguing based on the law and evidence for a $25,000 civil penalty, $5,000 in disgorgement, and declaratory and injunctive relief) *with* Defs.' Br. at 20 (defendants' summary assertion of good faith).)  Any argument about the amount of activity in violation, the appropriate civil penalty, the appropriate disgorgement amount, or the issuance of an injunction has therefore been waived.  And even with regard to good faith, defendants have not preserved all of their arguments.  In particular, although defendants do cite O'Donnell's testimony that she relied on advice from Vicki Davis and outside counsel to show good faith, as discussed *infra* pp. 13-16, defendants also claim that they will "address the competing testimony of Vicki Davis and [FEC Rule 30(b)(6) witness] Nataliya Ioffe . . . in their Sur Reply" (Defs.' Br. at 20).  But the failure of defendants to actually make these intended arguments about the testimony of these FEC witnesses in their moving/opposing brief means that any such arguments have been waived. Allowing defendants to make such arguments in their final brief would be unduly prejudicial to the FEC, which would have no further opportunity to respond.

## V.      EVEN IF DEFENDANTS HAVE NOT WAIVED THE CLAIM THAT THEY ACTED IN GOOD FAITH FOR PURPOSES OF ASSESSING A CIVIL PENALTY, THE RECORD HERE SHOWS A LACK OF GOOD FAITH

An important factor in determining a proper civil penalty is whether the defendants acted in good or bad faith.  (FEC Br. at 18.)  In this case, O'Donnell's decision to continue residing in the Townhouse for many months after learning that the arrangement was of dubious legality evidences a lack of good faith.  (*Id.*)  Defendants nevertheless argue that they acted in good faith because 1) O'Donnell allegedly consulted FEC reports analyst Vicki Davis about FEC rules; 2) the treasurer of the Committee allegedly contacted a still-unidentified New York lawyer on the same matter; 3) the Committee retained "blue-chip counsel, Cleta Mitchel[l]" to provide advice; and 4) the Committee used a square-footage measure to allocate rent and utilities for O'Donnell

13

to reimburse.  (Defs. Br. at 20.)  However, a closer examination of each of defendants'

arguments actually suggests a lack of good faith.

 As the FEC explained, O'Donnell's allegations as to the conversations with Vicki Davis

are not credible based on the record evidence.  (FEC Br. at 13-16.)  And as explained above

(*supra* p. 13), defendants have waived their right to challenge the contradictory testimony of

FEC employees on this issue.

 Defendants' claim of good faith based upon an alleged hearsay conversation between

former campaign manager Matt Moran and an unidentified New York lawyer also fails.  As an

initial matter, the alleged conversation did not even take place until February 2010 at the earliest,

after O'Donnell had already made the Townhouse her residence.  (O'Donnell Dep. at 44-45.)

When FEC counsel asked at deposition whether defendants were relying for their defense on that

alleged legal advice, thereby waiving the attorney-client privilege and allowing the FEC to learn

what was actually said on this alleged phone call, Christine O'Donnell stated:  "I don't think

that's even necessary.  Because the reality is the decision was already made."  *Id.* at 47; *see*

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994) ("A defendant

may also waive the privilege by asserting reliance on the advice of counsel as an affirmative

defense." (*citing Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156 (9th Cir.1992)).)  Giving

consideration to this alleged phone call now would be prejudicial to the FEC, much like

defendants' argument about how often O'Donnell slept at the Townhouse after she evaded

questions on that subject by testifying it was "irrelevant."  (*See supra* pp. 3-5.)  In any case, the

content of this alleged call is double hearsay, because there is no evidence in the record even

from Matt Moran, much less the New York lawyer.  There is only testimony from O'Donnell

about what Moran allegedly told her about a conversation he had had.

 Defendants' argument that they acted in good faith because they retained attorney

Cleta Mitchell has similar flaws.  As an initial matter, Mitchell's advice could not justify

defendants' illegal conduct because Mitchell did not begin representing the Committee until

"roughly" September 2010, nine months after O'Donnell had begun using the Townhouse as a

residence.  (O'Donnell Dep. at 86.)  Furthermore, FEC counsel also asked at deposition whether defendants were making an advice of counsel defense based on Cleta Mitchell's legal advice, thereby waiving the attorney-client privilege and allowing the FEC to learn what was actually said by Mitchell.  FEC counsel was told on the record that defendants would provide notice if they intended to make an advice of counsel defense.  (O'Donnell Dep. at 85-86.)  Because defendants never did so, it would be prejudicial to allow the defendants to rely on the purported legal defense now.

Finally, defendants' argument that they showed good faith by using a square footage measurement to determine how much O'Donnell should reimburse the campaign is incorrect. O'Donnell began using the Townhouse as a residence before she even knew how much she would pay, and without any written agreement, security deposit, or even an understanding of the duration of the agreement.  (O'Donnell Dep. at 44-45, 109, 111, 118.)  O'Donnell did not make her first reimbursement payment until April 14, 2010, well after the issue of the arrangement's legality was first raised in January or February of 2010.  (*Id.* at 64; Resp. to Disc., RFA 23.)  Her reimbursement payments make little sense if she was not in fact actually residing at the Townhouse, as she newly claims.  The evidence suggests not that defendants were making a good faith effort to comply with the law, but that they were attempting to avoid further scrutiny for the illegal arrangement they had already made.

This behavior is no more excusable because defendants may have been motivated in part by concerns about security and harassment.[1]  The record in this case establishes that there were

---

[1]  Moreover, despite defendants' current position that security and harassment were the sole reasons why O'Donnell might have wanted to hide where she lived from the public (Defs.' Br. at 16-18), there is evidence that there were other reasons.  The rumors that O'Donnell was not a Delaware resident and that she had lost a home to foreclosure were persistent enough that the campaign felt compelled to respond to them on its website.  (*See* http://christinepac.com/christine-counters at 8, FEC Exh. 9; *see also* O'Donnell Dep. at 72 (describing how the "Christine Counters" section was originally launched as part of the 2010 campaign website).)  It might have been politically inconvenient for O'Donnell to tell the public that she was living rent-free at an aunt's house, in an undisclosed location (O'Donnell Dep. at 32), but choosing political convenience does not show good faith for purposes of trying to comply with federal campaign finance law.

other properties available for rent at Greenville Place, which presumably had the same level of security as the Townhouse and which O'Donnell could have rented as a residence using her own personal funds. (*See* O'Donnell Dep. at 133, 137-38, 144 (describing how the campaign leased additional properties in Greenville Place for short-term staffer residences).)  And as noted above (*supra* p. 9), the FEC has approved requests to use campaign funds to pay for enhanced security at candidates' homes.  So O'Donnell was not faced with the Hobson's choice described in defendants' summary judgment brief of having to either make public a "plausible" address like the Townhouse or engage in "the kind of lie that can destroy a federal campaign."  (Defs.' Br. at 17.) [2]   O'Donnell need not have spent nights at a location where many campaign volunteers on a Senate campaign were coming and going.  The Court may set aside whether that in fact made her home less prone to be a place where she could be harassed; she could simply have lived in a different secure property and told the truth.

## CONCLUSION

For the foregoing reasons and those stated in the FEC's opening brief, summary judgment should be granted to the Commission and the Court should award appropriate remedies.

Respectfully submitted,

| | |
|---|---|
| Daniel A. Petalas (D.C. Bar No. 467908) | Harry J. Summers |
| Acting General Counsel | Assistant General Counsel |
| dpetalas@fec.gov | hsummers@fec.gov |
| | |
| Lisa J. Stevenson | Robert W. Bonham III |
| Deputy General Counsel – Law | Senior Attorney |
| lstevenson@fec.gov | rbonham@fec.gov |

---

[2]    She listed a P.O. Box, rather than the Townhouse address, on her FEC statement of candidacy and was aware of how to have her address unlisted, having done so in 2009.  *See* Amended Statement of Candidacy (March 20, 2009), http://docquery.fec.gov/pdf/262/29020134262/29020134262.pdf; 2010 O'Donnell Aff. ¶ 8 (stating that "[b]ecause of my prior candidacies and some experiences related to security at my home and for other personal reasons, . . . I chose not to disclose on any public filing(s) . . . [the] location [that] was my primary residence through the end of 2009").

Kevin Deeley  
Acting Associate General Counsel  
kdeeley@fec.gov

April 13, 2016

s/ *Seth Nesin*
Seth Nesin  
Attorney  
snesin@fec.gov

FOR THE PLAINTIFF  
FEDERAL ELECTION COMMISSION  
999 E Street NW  
Washington, DC  20463  
(202) 694-1650

17