# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FEDERAL ELECTION COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 15-cv-00017-LPS ) |
| FRIENDS OF CHRISTINE O'DONNELL CAMPAIGN COMMITTEE, *et al.* | ) ) ) |
| Defendants. | ) ) ) |

**SUR REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN ANSWER TO FEC'S MOTION FOR SUMMARY JUDGMENT**

April 25, 2016

/s/ *S.M. Hoersting*
Chris Gober (Lead Counsel)
cg@gobergroup.com
Stephen M. Hoersting*
sh@gobergroup.com
THE GOBER GROUP PLLC
PO Box 341016
Austin, TX 78734
(202) 849-9006

*Admitted *pro hac vice*

ATTORNEYS FOR DEFENDANTS

## TABLE OF CONTENTS

A.   THE O'DONNELL DEFENDANTS' OVERVIEW OF FEC's ASSERTIONS ON REPLY ............... 1

B.   THE O'DONNELL DEFENDANTS' FIVE ARGUMENTS ................................................................ 2

   Argument 1 ................................................................................................................................. 2

   Argument 2 ................................................................................................................................. 4

   Argument 3 ................................................................................................................................. 7

   Argument 4 ............................................................................................................................... 10

   Argument 5 ............................................................................................................................... 10

C.   AN ADDITIONAL THOUGHT ............................................................................................................ 12

D.   CONCLUSION ...................................................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Chevron USA, Inc. v. Nat. Resources Defense Council*,
  467 U.S. 837 (1984) ........................................................................................................... 3
*Davis v. FEC*,
  554 U.S. 724 (2008) ........................................................................................................... 1

**Other Authorities**

Advisory Op. 2014-03 (Edward Lindsay) ............................................................................... 8
OhioWatchDog.org, "Ohio False Statements Law Declared Unconstitutional,"
  http://watchdog.org/170273/false-statement-law-unconstitutional/ (Sept. 12, 2014).... 9

**Federal Regulations**

60 Fed. Reg. 7862 ........................................................................................................ 1, 2, 3, 9

**United States Code**

47 U.S.C. § 315 ......................................................................................................................... 9
52 U.S.C. § 30111 .................................................................................................................. 10
52 U.S.C. § 30114 .......................................................................................................... 1, 4, 7, 8

## A. THE O'DONNELL DEFENDANTS' OVERVIEW OF FEC's ASSERTIONS ON REPLY

The FEC asserts "there were other properties available for rent at Greenville Place, which presumably had the same level of security as the Townhouse and which O'Donnell could have rented as a residence using her own personal funds." Reply Br. at 15-16. The FEC makes this statement all the while certain there are *no* bedrooms for rent behind the security structures of Greenville Place as, presumably, one must rent an *entire apartment* to gain the security features available there, not just a bedroom with an attached bath. With this assertion, the FEC portrays the socio-economic cast lurking within the *per se* prohibition—and it isn't pretty. If the *per se* rule prohibited campaign committees from paying rent for *any* property owned or leased by candidates, that might be one thing. But under the Commission's rulemaking, an established landowner who makes a run for office can rent-out his beach house—or his warehouse, or a second home—to his campaign committee and his campaign committee can pay him rent at full-market rates, with no "personal use" accruing to the landowner-candidate under the "personal use" statute and Commission's regulations. 52 U.S.C. § 30114; *see also Expenditures; Reports by Political Committees; Personal Use of Campaign Funds*, 60 Fed. Reg. 7862, 7865 (Feb. 9, 1995) ("Explanation and Justification," "E&J").

This disparity demonstrates the constitutional infirmity in the FEC's litigation position, as well: A *per se* ban—as the FEC would have it; though its E&J says otherwise—on subleasing from a campaign committee under allocation formulas at market rates, burdens that candidate's fundamental right to commit personal resources toward a run for public office. *See Davis v. FEC,* 554 U.S. 724 (2008).

So long as Ms. O'Donnell is paying the Campaign Committee (the lessee to commercial lessor, Greenville Place) and the Campaign Committee is not paying Ms. O'Donnell—either as owner of Greenville Place (which Ms. O'Donnell is not) or, perhaps, as a first-leaseholder with Greenville Place (which Ms. O'Donnell is not), she should be permitted to sublease from the Campaign Committee at market rates according to allocation formulas—based, in this case, on a ratio of square-footage. This is veritably the same interpretation that Ms. O'Donnell testified that Vicki Davis provided her and her late-mother, Carole O'Donnell.

Defendants are not arguing an agency estoppel that flows from the statements of Ms. Davis; rather, Defendants argue a good faith that flows from a federal statute; from the questions posed to Ms. Davis by Ms. O'Donnell, Ms. O'Donnell's late mother, and by others within the campaign; and from the legal representation Ms. O'Donnell and the Campaign Committee retained during the election cycle.

## B. THE O'DONNELL DEFENDANTS' FIVE ARGUMENTS

The multiple factors at play in this case make it necessary to state the arguments the O'Donnell Defendants are making.

**Argument 1**

Defendants' first argument is that the *per se* prohibitions do not apply to the scenario presented in this case: Ms. O'Donnell did not own then, and does not own now, the property located at 1242 Greenville Place. The Explanation and Justification makes clear that the *per se* rules, for campaign funds and real property (not for clothing, etc.), were only to apply to properties owned *by the candidate or a member of the candidate's family*. *See* Explanation and Justification at 7865 (emphasis added). The E&J could not be more clear: "Paragraph (g)(1)(i)(E)"—the *per se* prohibition at issue in this case—"addresses the use of campaign

funds for mortgage, rent or utility payments on **real** or personal **property *owned* by the candidate or a member of the candidate's family**." Perhaps that rationale could be extended to property for which the candidate, or a member of the candidate's family, is the lessor and the campaign committee subleases from the candidate, as there is some risk that such transactions may not be conducted at arm's length for fair-market value. But not even that arrangement is applicable here. The Commission's rulemaking delineating the *per se* categories was designed to ensure that the rates paid by the campaign committee were for fair-market value and that excessive payments would not go to a landowner-candidate in something short of an arm's length transaction. We know this because of the other part of the rulemaking; the part that applies to other buildings owned by a candidate or a candidate's family. In those instances, the campaign committee and property owner must be able to establish that the rental transaction for a building other than the place the owner resides was for fair market value. E&J at 7865. It is important to realize that Greenville Place is a commercial landholder and lessor: It's entire business model and, therefore, its long-run existence, depends upon charging fair-market rates to lessees for the properties it leases.

The FEC is bound by the interpretation of its own E&J. *Chevron USA, Inc. v. Nat. Resources Defense Council*, 467 U.S. 837, 844 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations *are given controlling weight* unless they are arbitrary, capricious, or manifestly contrary to the statute (emphasis added)). That E&J makes plain that the *per se* prohibition does not apply where the candidate or his family does not own the property in question.

The FEC says the O'Donnell Defendants are hiding the statute behind ellipses. Reply Br. at 6. But this is not true. The statute at § 30114(a) lists permitted uses of campaign funds. 52 U.S.C. § 30114(a). Section 30114(b)(1) begins the discussion of prohibited uses and states that campaign funds "shall not be converted by any person to personal use." Section 30114(b)(2) states the general test for personal use: "any commitment, obligation or expense of a person that would exist irrespective of the candidate's election campaign;" meaning an item is for personal use if an individual would have to spend money on that item even if he or she were not running for office. Section 30114(b)(2) of the statute goes on to list examples of personal use, "including—(A) a home mortgage, rent, or utility payment." And here is the salient point: It is the Commission's E&J that explains that the items listed after the word "including" in the statute are *per se* prohibitions; the statute does not use the words "per se." *And it is that E&J that makes plain the* per se *categories apply only to property the candidate owns, or a member of the candidate's family owns.* When the candidate or a member of the candidate's family does not own the property in question, as is in this case, *the irrespective test detailed in the statute at § 30114(b)(2) comes back into effect.* This is irrefutable; by both a blackletter reading and straightforward application of the statute and Commission's rulemaking.

**Argument 2**

Defendants' second argument is as follows: Because the *per se* categories do not apply, and the irrespective test comes back into effect, the allocation method of enforcing the statute does apply. No one is arguing that the inapplicability of the *per se* prohibition obviates the need to prevent campaign funds from being converted to the personal use of any person. What is being argued between Plaintiff FEC and the O'Donnell Defendants is whether the

determination is made *per se*, or based on the irrespective test. The irrespective test permits the use of allocation formulas, whereas the *per se* prohibition (inapplicable in this case) does not. On this score, Ms. O'Donnell used allocation formulas at fair market value: She paid the Campaign Committee fair-market value for the bedroom and bathroom she designated as her legal residence. The fair market value was dictated by the arm's length agreement between the commercial lessor, Greenville Place, and the lessee, Campaign Committee. That market rates were paid in the transaction between Greenville Place and the Campaign Committee is undisputed. And, of course, that market rates were paid by the Campaign Committee to the utility companies is equally undisputed. *The market rates Ms. O'Donnell paid the Campaign Committee for her sublease are derivative of those arm's-length transactions*: Ms. O'Donnell paid an allocable share of the Campaign Committee's fair-market rent by first calculating the square footage she used, then applying that calculation as a ratio to the total rent at 1242 Greenville Place—rent set by a commercial lessor.

Ms. O'Donnell paid $770 per quarter to the Campaign Committee for her share of the rent and utilities. *See* FEC's Requests for Admission ("RfA") at ¶23. She made the payments quarterly because the Campaign Committee reported with the FEC quarterly. Ms. O'Donnell testified that she and her team made square-footage measurements. But any lay person realizes that if the townhouse was a 3-bedroom townhouse, then approximately one-third of the upper floor was dedicated to the legal residence of Ms. O'Donnell. If one-third of the upper floor was dedicated to Ms. O'Donnell's residence, that would mean that one-sixth of the square footage of two floors, or 16.6% of the total square footage for those two floors was allocable to Ms. O'Donnell. That would mean Ms. O'Donnell should have paid rent and utility payments in amounts roughly equal to 16.6% of the amounts the Campaign

Committee paid in a base month. A base month—for determining how much utility usage is attributable to one tenant—is a month which indicates very little campaign activity at the Campaign Committee.

There are 3 months in a quarter. One-third of $770 equals $256.66, which is the amount Ms. O'Donnell paid monthly to sublease her bedroom and bath within the townhouse. In January of 2010, the Campaign Committee paid $1,960.84 for rent and utilities (possibly for usage in the month prior). FEC RfA at 9. 16.6% of $1,960.84 = $325.49, which is slightly more than the $256.66 that Ms. O'Donnell paid for that month. In February 2010, the Campaign Committee paid $3,559.98 in rent and utilities. FEC RfA ¶ 10. 16.6% of $3,559.98 is $590.95, which is more than the $256.66 Ms. O'Donnell paid. But in March 2010, the Campaign Committee paid $108.00 in rent and utilities, FEC RfA ¶ 12, making Ms. O'Donnell's share paid for that month more than fourteen times the amount she owed. In April 2010, the Campaign Committee paid $2,114.33 for rent and utilities. FEC RfA ¶ 12. 16.6% of $2,114.33 is $350.97 or slightly more than the $256.66 that Ms. O'Donnell paid. In May 2010, the Campaign Committee paid $1,792.00 in rent and utilities. FEC's RfA ¶ 13. 16.6% of $1,792.00 = $297.47 or just slightly more than the $256.66 Ms. O'Donnell paid for that month. The average rent paid by the Campaign Committee, well before the height of campaign season, was (Jan. + Feb. +, etc.) $1,907. 16.6% of $1,907 equals an average monthly payment due of $316.56, or just over the $256.66 Ms. O'Donnell was paying. But when this Court considers that *1242 Greenville Place contained both a basement and a garage* overflowing with campaign yard signs, the square-footage allocation-ratios improve substantially in Ms. O'Donnell's favor—removing all doubt that the sublease payments she paid were every bit or more her share of the totals owed the commercial service providers.

So far we know 1) that, by the terms of the E&J, the *per se* prohibition does not apply to the subleasing arrangement here (because Ms. O'Donnell does not own 1242 Greenville Place), 2) that applicable allocations determine fair-market value where the *per se* prohibition does not apply, and 3) that Ms. O'Donnell used a reasonable, objective method of creating ratios that resulted in the payment of fair-market sublease payments. Defendants suggest to this Court that these are the best ways to resolve this dispute without adjudicating the many and substantial constitutional infirmities that lie in applying the *per se* prohibition to the Defendants in this case.

**Argument 3**

There is one more line of argument this Court can adopt and, at the same time, avoid any need to resolve the constitutional issues teeming beneath the surface of this case. This is the Defendants' third argument. This Court can find that Ms. O'Donnell's decision to make the townhouse her legal residence was a commitment or obligation that would not have exist[ed] irrespective of the candidacy. In their Answering Brief, the O'Donnell Defendants detail the reasons why Ms. O'Donnell's decision to declare the campaign headquarters her legal residence was a safety measure; necessary to protect her and her staff from threats and harassment. The O'Donnell Defendants then go on to explain why that safety measure was a qualified campaign expense; a commitment, obligation or expense that would not have exist[ed] irrespective of the candidacy. *See* 52 U.S.C. § 30114(b)(2).

If this Court finds that the decision to list the Campaign Committee address as Ms. O'Donnell's legal residence was an obligation that would not have existed irrespective of the candidacy, then any expenses associated with that decision are qualified campaign expenses, not conversions to the personal use of any person. Remember, the regulations are binary:

any obligation that is a campaign expense is *not* a conversion to personal use. E&J at 7862 (The FEC must determine, in each case, whether an expenditure is for official business, a qualified campaign expense, or for personal use). If so, any payments Ms. O'Donnell already made were unnecessary, and this case is at an end.

But the FEC is not so sure the decision to list 1242 Greenville Place as Ms. O'Donnell's legal address to the public was a measure to prevent threats or harassment. Reply Br. at 15, n.1. Indeed, the FEC says there were "rumors that O'Donnell was not a Delaware resident and that she had lost a home to foreclosure." *Id.* What's more, adds the FEC, "[i]t might have been politically inconvenient for O'Donnell to tell the public that she was living rent-free at an aunt's house, in an undisclosed location (O'Donnell Dep. at 32)." *Id.* It seems the FEC is suggesting that Ms. O'Donnell a) listed the residence as her legal address to get elected, but b) actually lived, resided, and laid her head elsewhere. Defendants wonder whether the FEC ever stops to consider that this suggestion and allegation, if true (despite the sweep of the record which suggests it is not true) would only further demonstrate that the decision to list the property as her legal residence *was for campaign purposes*? A decision on that basis would not have been made for personal reasons. Any related expense would not have existed irrespective of the O'Donnell candidacy. No resulting payments would have been converted to the personal use of anyone: such payments would have been for campaign use.

It seems the FEC believes it has caught Ms. O'Donnell in the act of dishonest campaigning (no doubt a rarity in American politics). But that is not the jurisdiction of the FEC. The Commission, itself, has long held that Federal candidates have wide discretion with respect to campaign spending, Advisory Op. 2014-03 (Edward Lindsay), which, in lay speak, means candidates have a right to say pretty much whatever they want. Federal

communications law prohibits broadcasters from having any "power of censorship" over the messages of candidates. 47 U.S.C. 315(a). And just recently, the Supreme Court unanimously granted standing to challengers of a "false [campaign] statements" law ministered by the Ohio Elections Commission; a law the High Court disparaged at oral argument for erecting George's Orwell's Ministry of Truth; a law subsequently struck down by a federal district court on remand. OhioWatchDog.org "Ohio False Statements Law Declared Unconstitutional," Sept. 12, 2014, available at http://watchdog.org/170273/false-statement-law-unconstitutional/. The FEC's jurisdiction is to police the personal use statute—and every step the FEC takes to prove Ms. O'Donnell listed a legal residence to save her campaign, not to rest her head, is a step closer to proving the expenses weren't of a personal nature. The FEC cannot have it both ways. Again, the operation of the personal use statute (and regulation) is binary: there is no such thing as an expense that is both personal *and* campaign. E&J at 7862.

The FEC also alleges that the Defendants are trying to create an issue of fact at the summary judgment stage of these proceedings. Reply Br. at 2. Not true. The undisputed fact is that Ms. O'Donnell declared 1242 Greenville Place as her legal residence. The legal question this Court must resolve is whether that fact is subject to the *per se* prohibition (it isn't); whether it is subject to allocation formulas to determine whether fair-market value was paid, or; whether that fact of legal residence is not personal use because it is an obligation, commitment, or expense that would not have existed irrespective of Ms. O'Donnell's candidacy.

**Argument 4**

Defendants' fourth set of arguments—though this Court need not reach them to reach a proper result in this case—are constitutional in nature. They have been addressed briefly in two of Defendants' Answering Briefs, one in Opposition to the FEC's Motion for Summary Judgment and the other in Opposition to the FEC's Motion to Dismiss Defendants' Counterclaims. Defendants haven't the pages here to flesh out these arguments and must rely on their description in other filings.

**Argument 5**

The Defendants' fifth argument can be paired with every other argument in this case: the argument of good faith. The Defendants have alleged good faith reliance on a regulatory interpretation in accordance with the Safe Harbor provision of 52 U.S.C. § 30111(e). *See* Answer and Counterclaims, ¶ 34. That regulatory interpretation comes right out of the Commission's E&J at 7865: the *per se* prohibition does not apply to property not owned by candidates or their families.  With regard to attorneys, Defendants do not assert that a New York attorney told campaign manager Matt Moran that subleasing, in this instance, is legal and that the substance of the advice proves compliance. The FEC contends that would trigger a waiver of attorney-client privilege on that point because the fact of the representation would be used to prove the substance of the advice given as to the scope of federal law. Defendants respect the FEC's contention (for this limited purpose). Therefore, Defendants' testimony is that there is a person named Matt Moran, who worked for the campaign, who told Ms. O'Donnell he received advice on the subleasing question from a New York lawyer who knows campaign law. The fact the question was asked, and that the advice—whatever that advice was—was followed, demonstrates good faith. Likewise, Defendants assert that

the Campaign Committee was later represented by Cleta Mitchell, and counsel to Defendants represents to this Court that Ms. Mitchell is perhaps one of the top ten or top twenty campaign finance attorneys in the United States. The fact of the representation, the fact of the advice that was provided on the relevant question (whatever that advice was), and the fact that Ms. O'Donnell's testimony is that she followed the advice, all demonstrate good faith. Last is Ms. O'Donnell's assertion that she and her late-mother, Carole O'Donnell, called, more than once, FEC employee Vicki Davis on the matter of subleasing, which also constitutes a good faith effort to comply with the personal use statute.

That leaves the factual dispute between the testimony of Ms. O'Donnell and that of Ms. Vicki Davis. Defendants believe that can be accounted for with the following explanation. Ms. O'Donnell testified that she and her late-mother, Carole O'Donnell, called Ms. Davis more than once on this question and obtained a favorable response: As long as the candidate is paying the committee at fair-market rates, and the committee is not paying the candidate, it should be okay. (This dovetails with the E&J). Yet neither Ms. O'Donnell nor Carole O'Donnell appear on the RAD call log with regard to this question (though they appear for other questions). Ms. O'Donnell noted during her deposition that there may have been a gap in the call log. In a separate deposition, Ms. Davis offered knowledge that Carole O'Donnell was Ms. O'Donnell's mother. *See* Deposition of Vicki Davis, attached as Ex. A. Both Ms. Davis and a Fed. R. Civ. P. 30(b)(6) expert provided by the FEC, *see* Deposition of Nataliya Ioffe, Ex. B, testified that a call to the Reports Analysis Division only triggers a report entry on a call log if the RAD analyst initiates an entry; entries are *not* created automatically. *See* Call Log at Ex. C. Both deponents testified that each analyst becomes the go-to person for a batch of political committees and that Ms. Davis was the go-to person for the O'Donnell Committee. Ms. Davis

had been asked by supervisors to enter more calls, albeit before the time of the O'Donnell calls on this topic. The deponents also made clear that the FEC supervisors audit the advice analysts give Committee representatives. Analysts receive follow up from supervisors for unapproved advice. And despite the FEC's assertion that analysts don't give legal advice, all the entered answers on the call logs are based in federal campaign law, and are no different in difficulty than the question posed by Carole O'Donnell and Ms. O'Donnell.

Defendants believe it is possible that Ms. Davis did not record on the call log the substance of the calls on the matter of personal use, either because she forgot, or because she knew her answer would be audited by her superiors. In any event, Ms. O'Donnell testified that she asked Ms. Davis this question. If Davis had told her no, where is the logged call saying no? And if Ms. O'Donnell never made a call to Ms. Davis on the question and was trying to evade the discovery of illegal activity, why did Ms. O'Donnell make disbursements to the Campaign Committee that are, in turn, reported to the FEC and later to the general public?

### C. AN ADDITIONAL THOUGHT

It is easy to look at the duration of these proceedings and to suppose, "Well, the FEC has come all this way; there must be a 'there' there." But this Court should not be so sure. The FEC's Counsel is nothing if not professional: but even professionals can engage in error. Because the costs of error in regulating campaign speech are high, they must be corrected by the nation's federal courts. After all, no less than our nation's highest Court has held that the FEC's "business is to censor." *Citizens United,* 558 U.S. at 335.

In America, attempting to better the system by running for public office—no matter one's political views or socio-economic station—is no civil offense. Ms. O'Donnell has spent six years in the proceedings and should not be charged in excess of $20,000 for campaign

expenses incurred by the Campaign Committee for the office space and utilities needed to launch an upstart campaign to federal office.

### D. CONCLUSION

Defendants' Motion for Summary Judgment should be granted. Plaintiff FEC's Motion for Summary Judgment should be denied.

Respectfully submitted,

*/s/ S.M. Hoersting*
Chris Gober (Lead Counsel)
cg@gobergroup.com
Stephen M. Hoersting*
sh@gobergroup.com
THE GOBER GROUP PLLC
PO Box 341016
Austin, TX 78734
(202) 849-9006

*Admitted *pro hac vice*

ATTORNEYS FOR DEFENDANTS

Dated: April 25, 2016

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 25th day of April, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Daniel A. Petalas
Acting General Counsel
dpetalas@fec.gov

Lisa Stevenson
Deputy General Counsel – Law
lstevenson@fec.gov

Kevin Deeley
Acting Associate General Counsel
kdeeley@fec.gov

Harry J. Summers
Assistant General Counsel
hsummers@fec.gov

Robert W. Bonham
Senior Attorney
rbonham@fec.gov

Seth Nesin
Attorney
snesin@fec.gov

FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

                                            */s/ S.M. Hoersting*
                                            Stephen M. Hoersting