## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FEDERAL ELECTION COMMISSION, :
          :
    Plaintiff,    :
          :
    v.      :  C.A. No. 15-17-LPS
          :
CHRISTINE O'DONNELL, *et al.*,  :
          :
    Defendants.   :

---

Seth Nesin, Daniel A. Petalas, Lisa J. Stevenson, Kevin Deeley, Harry J. Summers, Robert W. Bonham III, FEDERAL ELECTION COMMISSION, Washington, DC

 Attorneys for Plaintiff

Stephen M. Hoersting, Chris Gober, THE GOBER GROUP PLLC, Austin, TX

 Attorneys for Defendants

---

## **MEMORANDUM OPINION**

September 21, 2016
Wilmington, Delaware

**STARK, U.S. District Judge:**

This case is an enforcement action by the Federal Elections Commission ("FEC"

"Commission" or "Plaintiff") against Christine O'Donnell ("O'Donnell"), a candidate for the

United States Senate; the Friends of Christine O'Donnell ("Committee"), a campaign committee

supporting O'Donnell's candidacy; and Matthew Moran, in his official capacity as the

Committee's treasurer (together with O'Donnell and the Committee hereinafter referred to as

"Defendants").[1]  Plaintiff alleges that Defendants violated federal law prohibiting the use of

campaign contributions to pay rent on a candidate's residence.  As part of their defense,

Defendants contend that if Plaintiff's interpretation of the applicable regulation is correct, then

the regulation is unconstitutional.  Defendants have filed counterclaims based on this contention.

Discovery is complete.  Pending before the Court are Plaintiff's motion to dismiss

Defendants' counterclaims (D.I. 13) as well as cross-motions for summary judgment (D.I. 53,

58).  The Court received full briefing and heard extensive oral argument.  (*See* Transcript of May

3, 2016 Hearing ("Tr."))

Having considered the evidence, arguments, and pertinent authorities, the Court agrees

with the FEC's interpretation of the statute and regulations.  The Court also agrees with the FEC

that the statute and regulations are not unconstitutional.  Therefore, Defendants are liable for the

unlawful use of campaign contributions to pay the rent for O'Donnell's residence.  Thus, the

Court will grant-in-part and deny-in-part Plaintiff's motion for summary judgment, deny

---

[1]On March 12, 2015, Chris Marston, who replaced Moran as the Committee's treasurer,
was substituted for Moran as a defendant.  *See generally Will v. Mich. Dept. of State Police*, 491
U.S. 58, 71 (1989) (explaining that suit against individual acting in official capacity is not suit
against individual but is instead suit against official's office).

Defendant's motion for summary judgment, and grant Plaintiff's motion to dismiss the counterclaims.

While the issue of liability is now resolved, the Court is not able at present to determine the amount Defendants will have to pay and whether other, non-monetary relief is appropriate. The parties will be given an opportunity to provide the Court with their positions on whether resolution of issues relating to appropriate remedies requires further litigation, possibly to include trial.

## BACKGROUND

This case is about the misuse of campaign funds by a campaign committee and a candidate. In 2010, Christine O'Donnell was a candidate for the United States Senate from the State of Delaware. (D.I. 1 ¶ 6; D.I. 9 ¶ 6) In late 2009, O'Donnell's campaign committee, Friends of Christine O'Donnell ("Committee"), obtained a lease for a townhouse in Greenville, Delaware ("Townhouse"). (D.I. 55 Ex. 1 ("Rental Agreement")) The lease required the Committee to provide a $99 down payment and to pay $1,410 per month for rent. (D.I. 55 Ex. 1: (Defendants' Supplemental Responses to FEC's First Set of Interrogatories and Admission Requests ("RFA")) ¶¶ 6-7)[2] The lease agreement included a deferred rent payment of $235 per month that would be due only if the Committee defaulted on the lease. (*Id.*) The lease further provided that a late charge of 5% would be assessed for any payment received after the fifth of each month. (Rental Agreement ¶ 6(c))

The Committee used the Townhouse as a campaign headquarters. (*See* D.I. 1 ¶ 14; D.I. 9

---

[2]Plaintiff's discovery requests (which contain statements to which Defendants admit) can be found at D.I. 51 Ex. 1.

¶ 14)  Shortly after the Committee obtained the lease, O'Donnell decided that she would live in the Townhouse.  (*See* D.I. 59 Ex. A (O'Donnell Deposition ("O'Donnell Depo.")) at 28-29)  One of the reasons why O'Donnell decided to live in the Townhouse was to prevent harassment and ensure campaign security.  (*See id.* at 28-31)  An alternate living arrangement O'Donnell considered was to live with an aunt, but O'Donnell believed that would have endangered her aunt, given the threats O'Donnell perceived to her own safety.  (*See id.* at 31-32)

O'Donnell lived in the Townhouse from early 2010 through March 2011.  (*See id.* at 27-38; *see also* D.I. 60 at 2 (Plaintiff contending "there is overwhelming evidence that Christine O'Donnell resided at [the Townhouse] in 2010 and 2011"); D.I. 61 at 8 (Defendants apparently agreeing that O'Donnell "actually lived, resided, and laid her head" at the Townhouse))[3]  For the

---

[3]Defendants have not been entirely consistent as to whether O'Donnell actually lived at the Townhouse.  In their Answering Brief, Defendants argue that O'Donnell did not live at the Townhouse.  (*See* D.I. 59 at 5-8)  At that point Defendants' position was that O'Donnell merely used the Townhouse as her "legal residence," in order to comply with state and federal regulations without disclosing the location of her "actual residence."  (*See id.*)  In their Surreply Brief, Defendants altered their position, suggesting that "the sweep of the record" shows that O'Donnell actually lived at the Townhouse, using it as both her legal and actual residence.  (*See* D.I. 61 at 8)  During her deposition, O'Donnell first testified that the Townhouse was her residence (O'Donnell Depo. at 36), then later asserted that she "wasn't even technically living there" (*id.* at 105).  At the hearing, defense counsel was unable to state clearly whether Defendants believe the Townhouse was O'Donnell's personal residence.  (Tr. at 45-50) (attempting to distinguish between personal and legal residence)

Notwithstanding all of this, it is undisputed that O'Donnell slept at the Townhouse, that she kept personal items in the master bedroom, and that she intended to use the Townhouse as some form of residence.  (*See, e.g.*, O'Donnell Depo. at 35-38, 123-25)  She also listed the Townhouse address on her driver's license and it is where she was registered to vote.  (*See id.* at 37)  In responding to discovery requests, Defendants admitted that O'Donnell "resided at the [T]ownhouse beginning in January 2010."  (D.I. 60 Ex. 6 at p.5  ¶ 6)  Further, "[a]t no time during the administrative proceedings [that preceded this litigation] did Christine O'Donnell or the Committee take their current position that O'Donnell merely used the Townhouse as a sham address to fool the public about where she physically lived due to her alleged security concerns." (D.I. 60 at 3)  Even at the hearing, defense counsel eventually stated: "[T]here is no factual

first part of 2010, O'Donnell had exclusive control over the Townhouse's master bedroom. (*See* O'Donnell Depo. at 121)  Later, starting in July 2010, female campaign staffers also starting using the master bedroom. (*See id.* at 122)  Throughout the period she resided at the Townhouse, O'Donnell used the bedroom to sleep and work as well as to store clothes, makeup, and other items. (*See id.* at 123-24, 158)  She also had access to the Townhouse kitchen and to shared living areas. (*See id.* at 128)

At the time O'Donnell began using the Townhouse as her residence, she did not have a written lease or sublease agreement with the Committee; nor did she provide a down payment or security deposit. (RFA ¶¶ 25-26)  In fact, O'Donnell did not discuss with the Committee the prospect of paying rent until after she had already taken possession of the property. (*See* O'Donnell Depo. at 103)  O'Donnell eventually agreed to pay rent on a quarterly basis. (RFA ¶¶ 23-24)  Her quarterly rent obligation was $770, which is equivalent to a monthly rate of about $256.67. (*Id.* ¶ 23)  O'Donnell's agreement regarding payments on the Townhouse was never put in writing.

In September 2010, the FEC received a complaint alleging that O'Donnell and the Committee had violated the Federal Election Campaign Act ("FECA") by using campaign funds to pay for O'Donnell's rent and utilities at the Townhouse. (D.I. 55 Ex. 3)  In May 2012, the FEC voted 6-0 to open an investigation and, in November 2014, voted 6-0 to find probable cause that a violation of FECA had been committed. (*See* D.I. 55 Exhs. 7, 8)  Shortly thereafter, the

---

dispute that 1242 Presidential Avenue [i.e., the Townhouse] was the residence.  That's the residence." (Tr. at 50)

All of this establishes that the Townhouse was O'Donnell's "personal residence."  The Court's analysis and conclusions are based on such a determination.

4

FEC authorized this suit, again by a 6-0 vote. (*See* D.I. 55 Ex. 11)

Thereafter, on January 5, 2015, the FEC filed its Complaint against O'Donnell and the Committee alleging FECA violations and requesting declaratory relief, disgorgement, a civil penalty, and an injunction. (D.I. 1)  On April 17, 2015, Defendants filed an answer and several counterclaims. (D.I. 9)  The counterclaims allege that the FEC regulations upon which Plaintiff relies are unconstitutional and requests declaratory relief. (*See id.*)  On June 16, 2015, the FEC filed a motion to dismiss Defendants' counterclaims as redundant or, alternatively, for failure to state a claim. (D.I. 13)  On March 8, 2016, the FEC filed a motion for summary judgment and, on March 30, 2016, Defendants filed a cross-motion for summary judgment. (D.I. 53, 58)  The Court heard oral argument on all pending motions on May 3, 2016. (*See* Tr.)

## LEGAL STANDARDS

### A.     Motion to Dismiss

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F,3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481–82 (3d Cir. 2000) (internal quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that "raise a

right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact)." *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiffs claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

**B.      Motion for Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information; affidavits or declarations, stipulations (including those made for the purposes

6

of the motion only), admissions, interrogatory answers, or other materials," or by "showing that

the materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1)(A) & (B).  If the moving party has carried its burden, the nonmovant must then "come

forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal citation omitted).  The

Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make

credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,*

530 U.S. 133, 150 (2000).

     To defeat a motion for summary judgment, the non-moving party must "do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475

U.S. at 586; *see also Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 594 (3d Cir. 2005) (stating

party opposing summary judgment "must present more than just bare assertions, conclusory

allegations or suspicions to show the existence of a genuine issue") (internal citation omitted).

However, the "mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment;" and a factual dispute is genuine

only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).  "If

the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett,* 477 U.S.

317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the non-moving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the non-moving party. *Anderson,* 477 U.S. at 252.

## DISCUSSION

The parties agree that their disputes are ripe for summary judgment. According to the FEC, the undisputed facts show that Defendants violated 52 U.S.C. § 30114(b), which prohibits the use of campaign funds for "personal use." The Commission contends that Defendants violated this statutory provision by using campaign funds to pay for O'Donnell's rent and utilities at the Townhouse. Defendants counter that the FEC's interpretation of the regulations implementing the statute is incorrect and that Defendants' actions were permissible under the correct interpretation. Alternatively, Defendants continue, if the Commission's interpretation of the statute and implementing regulations is correct, then the regulations are unconstitutional, as they violate Defendants' rights under the First Amendment.

For the reasons stated below, the Court agrees with the FEC's interpretation of the statute and its implementing regulations and, applying that interpretation to the undisputed facts, further agrees that Defendants misused campaign funds for O'Donnell's personal use. The Court also agrees with the Commission that its interpretation of the regulation does not render it unconstitutional. However, the Court disagrees with the FEC that the record permits the Court to determine the appropriate amount Defendants must pay as a result of their violation. Instead, the Court will require the parties to provide their views on what further proceedings may be necessary to allow the Court to determine the appropriate remedies.

## A.    Defendants' Rent Payments Qualify as Personal Use

FECA provides that "a contribution or donation [to a political campaign or candidate] shall not be converted by any person to personal use." 52 U.S.C. § 30114(b)(1)&(2).[4]  The statute's definition of "personal use" consists of two parts.  First, the statute provides a general description, stating that "personal use" is the use of campaign funds "to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign." *Id.* at (b)(1).  Second, the statute contains a non-exhaustive list of expenses that qualify as personal use, including "a home mortgage, rent, or utility payment." *Id.* at (b)(2)(A).

Defendants contend that the prohibition on using campaign contributions for "rent" payments "applies *only* where a candidate . . . *owns* the real property in question." (D.I. 59 at 12)

---

[4]In full, the statute provides:

> (b) Prohibited use
>
> > (1) In general
> > A contribution or donation described in subsection (a) [i.e., "[a] contribution accepted by a candidate] shall not be converted by any person to personal use.
> >
> > (2) Conversion
> > For the purposes of paragraph (1), a contribution or donation shall be considered to be converted to personal use if the contribution or amount is used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign or individual's duties as a holder of Federal office, including –
> >
> > > (A) a home mortgage, rent, or utility payment . . . .

52 U.S.C. § 30114(b).

(emphasis in original)  The FEC takes the view that the prohibition applies to *all* rent (and utility) payments relating to a candidate's personal residence.  (D.I. 60 at 7)  The Court agrees with Plaintiff.

The statutory text makes no distinction between property owned by a candidate and property owned by someone else.  *See* 52 U.S.C. § 30114.  Instead, the statute provides without qualification that *any* "home mortgage, rent, or utility payment" is a prohibited personal use.  *See id.*  Because the statute is unambiguous, the Court does not need to consider the text of the implementing regulation in order to conclude that Defendants' conduct was impermissible.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

Nevertheless, consideration of the implementing regulations – to which the parties have devoted a great deal of attention (*see, e.g.*, D.I. 54 at 8 (citing 148 Cong. Rec. S1991-02 (daily ed. Mar. 18, 2002) (stating Congress "rewrote FECA's personal-use statute to codify the Commission's regulation"))) – does not alter the Court's conclusion.  If the statute were ambiguous, the Court would be obligated to provide deference to the FEC's interpretation, as the Supreme Court requires "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron*, 467 U.S. at 844; *see also* 52 U.S.C. § 30107(a)(8) (delegating authority to FEC to "make, amend and repeal" rules necessary to implement FECA).  Even without deference, the Court concludes that Defendants' conduct violates the plain language of the implementing regulations.

Like the statute, the regulations define personal use as "any use of funds . . . to fulfill a

10

commitment, obligation or expense . . . that would exist irrespective of the candidate's

campaign" and provides a non-exhaustive list of activities that qualify as "personal use."  11

C.F.R. § 113.1(g).[5]  Also like the statute, this list expressly provides that "mortgage, rent or

---

[5]In pertinent part, the regulation provides:

> (g)  Personal use.  Personal use means any use of funds in a
> campaign account of a present or former candidate to fulfill a
> commitment, obligation or expense of any person that would exist
> irrespective of the candidate's campaign or duties as a Federal
> officeholder.

>> (1)(i)  Personal use includes but is not limited to the
>> use of funds in a campaign account for any item
>> listed in paragraphs (g)(1)(i)(A) through (J) of this
>> section:

>> . . . .

>> (E)  Mortgage, rent or utility
>> payments –

>>> (1)  For any part of
>>> any personal
>>> residence of the
>>> candidate or a
>>> member of the
>>> candidate's family; or

>>> (2) For real or
>>> personal property that
>>> is owned by the
>>> candidate or a
>>> member of the
>>> candidate's family
>>> and used for
>>> campaign purposes, to
>>> the extent the
>>> payments exceed the
>>> fair market value of
>>> the property usage.

utility payments" qualify as personal use. *Id.* Unlike the statute, however, the regulation's prohibition on mortgage and rent payments is not absolute. *See id.* Instead, the regulation prohibits only two types of mortgage or rent payments: (1) payments "[f]or any part of any personal residence of the candidate," and (2) payments "[f]or real or personal property that is ***owned by*** the candidate and used for campaign purposes, to the extent the payments exceed the fair market value of the property usage." *Id.* (emphasis added).

The Court agrees with the FEC that the first category of payments identified in the non-exhaustive list applies here and prohibits Defendants' payments. Thus, it is a prohibited "personal use" to use campaign funds on rent payments "for any part of any personal residence of the candidate." Here, campaign funds held by the Committee were used to pay a large part of the rent owed on the Townhouse, at times when O'Donnell was using the Townhouse as her "personal residence."

Defendants' argument against this straightforward interpretation of the regulation asserts that the narrowing ownership requirement contained in the second category of prohibited payments applies to the first category as well. In other words, Defendants insist that use of campaign funds to pay rent to or for a candidate qualifies as prohibited "personal use" only if the property for which the rent is being paid is "owned by the candidate" (and even then only if the payment exceeds fair market value). For this contention, Defendants rely on the "Explanation and Justification" ("E&J") the FEC issued to accompany the regulation.

The E&J states that the regulation, 11 C.F.R. § 113.1, "addresses the use of campaign funds for [rent] payments on [property] owned by the candidate." 60 Fed. Reg. 7865.

---

11 C.F.R. § 113.1(g).

Defendants take this statement in the E&J to argue that the entirety of the regulation addresses and is limited to the circumstance in which the candidate owns the property being rented. But this is not a correct interpretation of the E&J, or, therefore, of the regulation.

When construing administrative regulations, the Court is required to defer to the interpretation offered by the authoring agency. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997). Hence, Defendants' burden is to show that the FEC's interpretation of 11 C.F.R. § 113.1 is "plainly erroneous or inconsistent with the regulation" itself. *Id.* Defendants fail to do so.

The portion of the E&J upon which Defendants' rely states that the regulation addresses the use of campaign funds to pay rent on a property owned by the candidate, but the E&J does *not* state that it *only* addresses such situations. The entirety of the statement on which Defendants' position rests is as follows: "Paragraph (g)(1)(E) of the final rules addresses the use of campaign funds for mortgage, rent or utility payments o personal property owned by the candidate or a member of the candidate's family." 60 Fed. Reg. 7865; *see also* D.I. 59 at 13. This statement in the E&J is referring to what the Court described above as the regulation's "second category" of prohibition. This statement in the E&J does not address the regulation's "first category" – which is the category applicable to the undisputed facts in this case.

In the end, Defendants' position rests on nothing more than a misinterpretation of one sentence in the E&J. Other statements in the E&J demonstrate the overall breadth of that document as well as the incorrectness of Defendants' interpretation. *See, e.g.*, 60 Fed. Reg. 7863 ("The use of campaign funds to pay the personal living expenses of the candidate is a prohibited personal use under these rules."), *id.* at 7865 ("[T]he use of campaign funds for mortgage, rent or utility payments on any part of a personal residence of the candidate or a member of the

13

candidate's family is personal use." ), *id.* ("The rule prohibits payments for use of a personal residence because the expenses of maintaining a personal residence would exist irrespective of the candidate or the Federal officeholder's duties.").

In sum, Defendants would have the Court adopt an interpretation that is at odds with unambiguous statutory language, at odds with unambiguous regulatory language, and at odds with the most straightforward reading of the E&J. Defendants' position is further inconsistent with the FEC's reasonable interpretation of the statute, the regulation, and the E&J – all of which the Court is obligated to defer to. Thus, the Court holds that the FECA and the implementing regulation prohibit as "personal use" the use of campaign funds to pay rent or utility expenses for a candidate's personal residence.

### B.    O'Donnell's Use of Campaign Funds Constitutes Personal Use

The undisputed evidence, taken in the light most favorable to Defendants, establishes that Defendants violated FECA's personal-use prohibition. No reasonable juror reviewing the record could find to the contrary.

O'Donnell used the Townhouse as her personal residence. But rather than paying the full amount of rent owed – $1,410 per month (RFA ¶ 7), plus the one-time $99 security deposit (RFA ¶ 6) – she reached an agreement with the Committee whereby the Committee paid all of the rent other than the $770 O'Donnell paid the Committee on a quarterly basis. This is equal to about $256.66 per month. The difference between the amount the Committee paid for the Townhouse and the amount O'Donnell paid the Committee constitutes an unlawful conversion of campaign funds to personal use.

Even assuming it could be viewed as proper for the Committee to pay the portion of the

rent and facilities on the Townhouse associated with the non-personal residence parts of the

Townhouse, and for O'Donnell to have to pay only the portion of the rent and facilities

associated with the master bedroom and the other parts of the house which she used or had

control over, the uncontested facts still establish that O'Donnell's payments to the Committee

were insufficient. Starting in April 2010, O'Donnell made five quarterly payments of $770. As

noted, this is equal to about $256.66 per month. (RFA ¶ 23)  The Townhouse contained three

bedrooms, a kitchen, and shared living space. (RFA ¶ 2)  Because O'Donnell resided in the

master bedroom of the Townhouse, and had access to the kitchen and the shared living space, a

reasonable but conservative estimate of her fair monthly rental obligation would be $1,410

divided by three, which equals $470/month. At best, O'Donnell paid $213 per month less than

what she should have paid to cover her share of the rent.

The utilities at the Townhouse cost $4,264.40[6] for the duration of O'Donnell's fifteen

month sub-lease, amounting to $284.29 per month. Because the Committee used the Townhouse

as a campaign headquarters, it is difficult to determine what proportion of monthly utility use

should be attributed to O'Donnell. One reasonable estimate would be that O'Donnell was

responsible for one-third of the utility use per month, or approximately $95 each month.

However, given that O'Donnell only paid the Committee a total of $256.66 per month, and this is

less than even her conservative, reasonable share of the rental obligation, she effectively paid

nothing for the utilities. Thus, again, Defendants converted campaign contributions to a

---

[6]Pursuant to the Court's order of February 29, 2016, Defendants are deemed to have admitted paying $15,526.20 to Comcast and Delmarva Power for the Townhouse during O'Donnell's sub-lease period. (*See* D.I. 52; *see also* D.I. 51 Ex. 1 ¶¶ 9-22)  The FEC relies on these admissions only up to the amount of $4,264.40. (*See* D.I. 54 at 4 n.1)

prohibited personal use.

Another way to present the same numbers follows. For each of the five quarters when O'Donnell had the sublease arrangement with the Committee, the Committee had to pay out an average of $5,082.87 (i.e., $1410 in monthly rent plus $284.29 in monthly utilities, for a monthly total of $1694.29, multiplied by three months equals $5,082.87 owed per quarter). A reasonable, conservative estimate of O'Donnell's fair share of these obligations is one-third, which is equal to $1,694.29 per quarter. But the undisputed evidence is that O'Donnell paid only $770 per quarter, which is far less than the value of what she obtained. Hence, even assuming that this type of expense allocation for shared arrangement involving a candidate's personal residence and campaign facilities is permissible, O'Donnell far underpaid what she owed.[7]

In their Reply Brief, Defendants propose, for the first time, a different allocation scheme. Defendants argue that the Townhouse has three rooms on each of two floors, as well as a garage and a basement, and thus that O'Donnell should be responsible for less than one-sixth of the monthly rent. (*See* D.I. 61 at 6) As an initial matter, this argument is waived. In their first summary judgment brief, Defendants did not address whether O'Donnell paid fair market value for her use of the Townhouse. Instead, Defendants argued that O'Donnell did not need to pay

---

[7]As the FEC explains in its briefing, one important reason why the statute and regulations adopt a bright-line rule against use of campaign contributions to pay a candidate's rent, mortgage, and utilities is because allocating these expenses – between purported campaign use, which is only necessitated by a candidacy, and personal use, which is necessary even in the absence of a candidacy (i.e., the person running for office always needs to live somewhere) – requires an undesirable, complex, and intrusive undertaking by a government agency into the activities of a political candidate. (*See* D.I. 54 at 11 ("The Commission does not permit the allocation of those expenses because doing so would require the potentially invasive and difficult process of calculating the fair market value of what was received by the candidate."); D.I. 60 at 1 (explaining that "FEC's *per se* ban on these arrangements reasonably avoids such potentially sensitive inquiries"))

*any* rent because she did not actually live at the Townhouse.  Defendants are not permitted to

reserve material for a reply brief that could and should have been included in their opening brief.

*See* D. Del. L.R. 7.1.3(c)(2) ("The party filing the opening brief shall not reserve material for the

reply brief which should have been included in a full and fair opening brief."); *Ad Hoc Comm. of*

*Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 562 n.168 (D. Del.

2008) (citing D. Del. L.R. 7.1.3(c)(2) and rejecting argument because it was raised for first time

in reply brief).

Even if it had not been waived, Defendants' new argument – which essentially seeks to

allocate payment obligations based on square footage – is unavailing.  O'Donnell's use of the

Townhouse was not limited to the master bedroom.  O'Donnell also had access to each of the

shared spaces in the Townhouse.  (*See* O'Donnell Depo. at 128)  While it is possible that

O'Donnell did not use the kitchen or shared space extensively, the fact that the common areas

were available to her means that allocating rent and utility payments based exclusively on the

master bedroom's proportion of the overall square footage of the Townhouse would not reflect

the fair market value of what O'Donnell received.[8]

Defendants also argue that O'Donnell's payments to the Committee should be

characterized as security expenses rather than rent payments.  (*See* D.I. 61 at 7)  Defendants

---

[8]Defendants similarly argue that O'Donnell had a reduced rent obligation because she
spent many nights away from the Townhouse.  (*See* D.I. 59 at 8 (explaining that O'Donnell used
the Townhouse mostly for campaign purposes))  This is unpersuasive.  O'Donnell rented at least
the master bedroom, meaning that the space was reserved for her (and sometimes others)
throughout the duration of the sub-lease.  The fact that she elected not to use the space every
night does not mean that the space was not available to her every night.  There is no evidence that
O'Donnell and the Committee had a "hotel-like arrangement," whereby the candidate only had to
pay for nights she stayed at the Townhouse.

17

maintain that O'Donnell's decision to use the Townhouse as her legal residence was "a safety
measure" that was "necessary to protect her and her staff from threats and harassment." (*Id.*)
For several reasons, the record does not allow a reasonable factfinder to make such a finding.
First, even if O'Donnell chose to live at the Townhouse because of its security amenities (which
included a guard), that would not change the fact that O'Donnell lived in the master bedroom and
incurred an obligation to pay rent for her use of the space as her personal residence – an
obligation she would have incurred (somewhere) even were she not a candidate for office. *See
generally FEC v. Craig for U.S. Senate*, 2016 WL 850823, at *12 (D.C. Cir. Mar. 4, 2016)
(rejecting argument that Senator should be able to use campaign funds for legal expenses relating
to attempt to withdraw guilty plea because Senator would not have attempted to withdraw plea if
he were not an officeholder).  Second, there is no evidence that Defendants ever viewed
O'Donnell's payments to the Committee as being for security, as opposed to being for a portion
of the rent and utilities.  Defendants did not even suggest that the payments were for security
until well into this case (i.e., during O'Donnell's deposition) – by which time Defendants had
been responding to the FEC for years. (*See* Tr. at 43-44)  They did not characterize the rent
payments as security expenses in their Answer to the Complaint in this action.  Moreover,
O'Donnell's testimony that she was concerned about the legality of her living arrangement (*see*
O'Donnell Depo. at 103), and the fact that she paid anything for it, again suggest that Defendants
viewed the arrangement as one in which O'Donnell was helping pay for her ***personal residence*** –
and not viewing expenditures relating to the Townhouse as a security expense (for which, as a

legitimate campaign expenditure, O'Donnell may not have had to pay anything).[9]

There are at least two other ways in which the record compels as the only reasonable conclusion that Defendants violated FECA by using campaign funds for personal use. First, while O'Donnell moved into the Townhouse in January 2010, she did not agree to pay rent until mid-February of that year. (*See* O'Donnell Depo. at 101) This means that, at an absolute minimum, the Committee used campaign funds to cover O'Donnell's rent and utility obligations for approximately six weeks, effectively extending O'Donnell an interest-free loan. Second, O'Donnell's sublease agreement with the Committee treated her better than fair market terms and far better than the Committee itself was being treated by the owner of the Townhouse, in that the sublease agreement was not in writing, did not have an early termination fee, and did not impose any late fees. (*See* RFA ¶¶ 25-27; O'Donnell Depo. at 109-11) While these violations may seem trivial – and they are neither the sole nor primary bases for liability – they do confirm that a reasonable factfinder would be compelled to find liability on the record before the Court.

In short, a reasonable factfinder reviewing the record in the light most favorable to Defendants could only conclude that Defendants are liable for converting campaign funds to the personal use of O'Donnell, by paying substantial portions of her rent and utility expenses on the Townhouse, which was her residence for 15 months. Accordingly, the FEC is entitled to summary judgment of liability and Defendants' request for summary judgment must be denied.

---

[9]According to the FEC, had O"Donnell actually believed the expenditures were necessitated by security concerns, she could have sought FEC approval to use campaign funds for security, and the FEC may have approved such a use. (*See* Tr. at 67-68) It is undisputed that, even though the Committee was at the time represented by experienced counsel, Defendants did not ask the FEC whether they could use campaign funds to pay for the Townhouse as a security measure. (*See id.* at 68-69)

C.    **FECA Does Not Violate the First Amendment**

As explained above, FECA defines personal use in two ways.  First, FECA includes a general definition that defines a personal expense as an expense that would exist irrespective of the candidate's campaign.  Second, FECA includes a list of expense categories that automatically qualify as personal use.  The list includes mortgage, rent, or utility payments; clothing; noncampaign-related automobile expenses; country club memberships; vacations; household items; tuition payments; admission to sporting events; concert, theater, or other entertainment not associated with an election campaign; and health-club dues.  *See* 52 U.S.C. § 30114(b)(2). Defendants contend that these provisions are unconstitutional in violation of the First Amendment, both as-applied and facially.  The Court disagrees.

Defendants' constitutional challenge fails because FECA's prohibition on converting campaign funds for personal use does not regulate or affect speech or speech-related activities. The prohibition does not restrict the content of one's message; nor does it limit the amount of speech or political activity in which one can engage.  On its face, then, the prohibition does not implicate First Amendment concerns.

Nevertheless, Defendants argue that the rule violates the First Amendment because it limits the ways in which individuals can spend campaign funds.  (*See* D.I. 17 at 9-14)  Pointing to the Supreme Court's decisions in *Citizens United v. FEC*, 558 U.S. 310 (2010), and *Buckley v. Valeo*, 424 U.S. 1 (1976), Defendants contend that "any government-imposed restriction on campaign expenditures must meet strict scrutiny."  (D.I. 17 at 12)  This is incorrect.

*Buckley* explains that there are some instances in which money is needed to facilitate political expression and that, in those instances, limiting or restricting one's spending can create

First Amendment problems. *See* 424 U.S. at 19 ("A restriction on the amount of money [one] can spend on political communication . . . necessarily reduces the quantity of expression . . . ."). At the same time, *Buckley* recognizes that there are other instances in which money is *not* needed to facilitate political expression. In those instances, limiting or restricting one's spending poses much less of a First Amendment concern. *See id.* at 20 ("By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate . . . entails only a marginal restriction upon the contributor's ability to engage in free communication."). "Laws that burden *political* speech are 'subject to strict scrutiny.'" *Citizens United*, 558 U.S. at 340 (emphasis added).

Defendants have failed to explain how FECA's personal-use prohibition restricts or limits *political* speech. Defendants have not shown how Defendants' use of campaign funds to pay O'Donnell's rent and utility obligations has expressive value. O'Donnell, like any other person, needed to live somewhere, regardless of whether she was running for federal office, so a payment for her living space was payment for a personal expense, *not* a payment to facilitate political expression. Thus, strict scrutiny does not apply to Defendants' as-applied challenge to the prohibition.

Defendants' facial challenge fails for similar reasons. In order to prevail on a facial challenge under the First Amendment, Defendants must show that FECA's personal-use prohibition (or at least its list of *per se* categories) is substantially overbroad. *See Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The overbreadth must be real and substantial when viewed "in relation to the statute's plainly legitimate sweep." *Id*. This means that Defendants must show that there are a substantial number of campaign expenses that are prohibited under the

21

personal-use prohibition, but that constitute or facilitate political speech. Defendants, however, fail to identify *even one* fact pattern in which a prohibited expense would interfere with political speech. Defendants have failed to demonstrate *any* overbreadth, let alone the substantial overbreadth that would be required to invalidate the personal-use prohibition.

### D.   The Personal-Use Prohibition Is Subject To, and Withstands, Rational Basis Review

Because the personal-use prohibition does not implicate a First Amendment harm, it is subject to rational basis review. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). Under rational basis review, a rule is unconstitutional only if it is not "rationally related" to a "legitimate" government interest. *See Parker v. Conway*, 581 F.3d 198, 202 (3d Cir. 2009). This is a deferential standard, and those challenging a legislative classification must rebut "every conceivable basis" for the policy. *See Beach Commc'ns, Inc.*, 508 U.S. at 315.

The personal-use prohibition passes rational basis review. The policy reduces corruption and promotes public confidence in the campaign finance and political system. The policy also increases participation in the political process by allowing contributors to support a campaign without worrying that their funds will be converted to personal use.

The list of expenditures that automatically qualify as personal use also withstands rational basis review. The list of prohibited expenses includes expenses that are always or almost always personal in nature (e.g., rent on a personal residence, vacations, country club dues). A blanket ban on these types of expenses provides candidates with clear boundaries and allows the FEC to monitor campaign expenses without conducting a burdensome, invasive, and expensive

investigation.[10]  The list also reduces corruption and the perception of corruption.  Thus, the personal-use prohibition and list of *per se* personal uses are rationally related to legitimate government interests.  Therefore, they are not unconstitutional.

None of the multiple ways Defendants articulate their constitutional challenge alters these conclusions.  Defendants argue that the statute "frustrate[s] O'Donnell's right to commit personal resource towards a candidacy for federal office."  (D.I. 59 at 18)  But the personal-use prohibition does not limit how O'Donnell, or any individual, may use her personal resources; it only prohibits the conversion of campaign funds to personal use.  One is permitted to use a personal residence for campaign purposes – one just cannot accept payment from campaign funds for such use.

Defendants contend that the statute impermissibly prohibits the Committee's ability to make campaign expenditures.  (*Id.* at 19)  While it is true that the personal-use prohibition eliminates the Committee's ability to use campaign funds to pay the personal expenses of a candidate, or to pay rent to the candidate for use by the Committee of that personal residence, the candidate's personal expenses do not implicate speech or the First Amendment, for the reasons already explained above.  As the E&J explains, "[i]t is important to note that paragraph (g)(1)(i)(E)(1) does not prohibit the campaign from using a portion of the candidate's personal residence for campaign purposes.  It merely limits the committee's ability to pay rent for such a use."  60 Fed. Reg. 7865.

---

[10]By contrast, as the FEC explains, "[u]nder the allocation scheme [D]efendants favor, the FEC would ordinarily have no way of knowing, without undergoing an investigation into a candidate's living arrangements, whether the amounts reported as reimbursements from the candidate to her campaign represent the actual market value of the portion of the property she was using as her residence."  (D.I. 19 at 5)

Defendants argue that the personal-use prohibition is impermissible because it was issued "in the name of administrative efficiency." (D.I. 59 at 19)  But they cite no authority to support the conclusion that this fact alone makes the prohibition unconstitutional.[11]  Here, to the contrary, the bright-line prohibition against personal use actually appears to promote First Amendment freedoms because it reduces (if not eliminates) the need for the FEC to undertake intrusive, fact-intensive investigations of how candidates spend campaign funds.  *See generally Buckley*, 424 U.S. at 29-30 (upholding contribution limits even though "most large contributors do not seek improper influence over a candidate's position or an officeholder's position").

Finally, Defendants argue that the personal-use prohibition unfairly harms "property owners who may want to finance a campaign to Federal office by deploying real assets." (D.I. 59 at 19)  But, again, the personal-use prohibition does not restrict how a candidate uses her own property other than precluding her from leasing her personal residence to a campaign committee and then collecting rent from the campaign committee.  The candidate is free to rent her personal residence to anyone else (and be paid to do so) and is likewise free to rent to her campaign committee (and receive fair market value rental payments from the committee for) real property that is not her personal residence.

In sum, the challenged provisions survive rational basis review.  Plaintiff's motion to dismiss Defendants' counterclaims will be granted.

---

[11]Contrary to Defendants' contention (*see, e.g.*, Tr. at 55-57), the FEC is not defending the constitutionality of the personal-use prohibition solely based on efficiency.  Nothing in the Supreme Court's decisions in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011), or *Davis v. FEC*, 554 U.S. 724 (2008), undermines the FEC's position.

### E.      Remedy

Having concluded that Defendants improperly converted campaign funds to personal use, the Court turns to the issue of the appropriate remedy.  Plaintiff asks the Court to order Defendants to jointly pay a $25,000 civil penalty, order O'Donnell to disgorge $5,000 to the U.S. Treasury, and provide declaratory and injunctive relief (i.e., declare that Defendants violated FECA and enjoin them from doing so again should O'Donnell become candidate for federal office).  (*See* D.I. 54 at 16, 19-20)

FECA authorizes the Court to "grant a permanent or temporary injunction, restraining order, or other order, including a civil penalty which does not exceed the greater of $[7,500] or an amount equal to any contribution or expenditure involved in such a violation" against each liable party. *See* 52 U.S.C. § 30109(a)(1)(6)(B); 11 C.F.R. § 111.24(a)(1); *see also* 28 U.S.C. § 2461.  The Court has considerable discretion when deciding what penalty is appropriate. *See United State v. Mun. Auth. of Union Twp.*, 150 F.3d 259, 264 (3d Cir. 1998); *see also Tull v. United States*, 481 U.S. 412, 426-427 (1987).  When choosing what penalty to impose, the Court is to consider a variety of factors, including the penalty's deterrent effect, *see FEC v. Craig for U.S. Senate,* 70 F. Supp. 3d 82, 99-100 (D.D.C. 2014), *aff'd*, 2016 WL 850823 (D.C. Cir. Mar. 4 2016); the necessity of vindicating the authority of the FEC, *see FEC v. Comm of 100 Democrats*, 844 F. Supp. 1, 7 (D.D.C. 1993); and Defendants' inability to pay, *see id.*  Finally, when setting the penalty, the Court should consider whether Defendants acted in bad faith. *See United States v. Reader's Digest Ass'n. Inc.*, 662 F.2d 955, 967 (3d Cir. 1981).

All parties insist that the Court can assess these multiple factors and determine the appropriate remedy based on the record as it currently exists.  Both sides, of course, have moved

for summary judgment, and both also expressly confirmed at the hearing that the Court can decide the remedial issues. (*See* Tr. at 15 (FEC counsel: "The Commission does not believe [a trial on remedies] is necessary,"), 64 (Defendants' counsel confirming absence of need for trial on remedies)) At this point, however, the Court is not persuaded, notwithstanding the parties' (uncharacteristic) agreement.

Instead, it appears from the record that there are genuine disputes of material fact on at least some of the issues that the Court should consider in determining the appropriate remedy. Most prominent on this list is the issue of Defendants' good faith.

Defendants assert that they sought and obtained guidance from an FEC campaign finance analyst, Vicki Davis, who approved of O'Donnell's living arrangements and the way in which campaign contributions were used to pay for the Townhouse. In her deposition, O'Donnell testified about several conversations she and her mother had with Ms. Davis. (*See, e.g.*, O'Donnell Depo. at 49, 57, 64, 68-70, 103-04) It appears that a reasonable factfinder could credit this testimony. If so, and if these conversations took place as O'Donnell describes, and if O'Donnell received the advice she claims to have received from the FEC, that would be a substantial factor in assessing whether Defendants acted in good faith – which in turn is likely to impact the Court's assessment of the proper remedy.

For its part, the FEC insists that no such conversations with Ms. Davis took place. (*See* Tr. at 74-75) As the FEC points out, Ms. Davis's call logs do not reflect having had the conversations and Ms. Davis has no recollection of any phone calls like those described by O'Donnell. (*See* D.I. 54 at 5-6 (summarizing evidence, including call logs, depositions, and declarations); D.I. 55 Ex. 17 ¶ 11 (Davis Declaration: "I do not believe I was ever involved in

26

any phone call about that question.  Due to the fact that I am trained not to provide interpretive legal advice and guidance, I am certain that I never told Christine O'Donnell or any other representative of Friends of Christine O'Donnell that such a residence would be legal.")) Furthermore, O'Donnell submitted an affidavit to the FEC in December 2010 that does not mention any reliance on any advice from the FEC regarding the legality of residing at a Townhouse paid for in part by campaign funds.  (*See* D.I. 55 Ex. 5)  Consequently, there is sufficient evidence which, if believed, would show that O'Donnell did not have the conversations with Ms. Davis, undermining her protestations of good faith and perhaps showing actual bad faith by misrepresenting facts to the Court.

It seems, then, that resolution of the factual disputes about O'Donnell's purported conversations with the FEC's Ms. Davis could be highly pertinent to the Court's task of determining an appropriate remedy.  The Court has not had the opportunity to observe the witnesses' demeanor; and, of course, on summary judgment the Court may not make credibility determinations. *See Reeves,* 530 U.S. at 150-51.  While the Court is not anxious to extend these proceedings, and does not wish to require the parties to engage in evidentiary proceedings no party believes necessary, it is unclear how the Court can resolve the pertinent disputes, and assess the appropriate remedy, on the present record.[12]

---

[12]To the extent Defendants are also attempting to rely on the purported advice O'Donnell received from Ms. Davis as a defense to liability (as opposed to being a relevant consideration relating to remedy), there is no genuine dispute of material fact. FECA's "safe harbor" provision, 52 U.S.C. § 30111(e), insulates from liability a person acting in good faith reliance on "any rule or regulation prescribed by the Commission." Ms. Davis's statements, even if made as O'Donnell contends, do not constitute a rule or regulation. (*See* D.I. 54 at 13) ("No FEC employee can authorize a violation of federal law or make statements that estop the government from enforcing a law.")  It is further undisputed that O'Donnell did not seek or rely on an "advisory opinion" from the FEC.

Accordingly, the Court will deny the parties' summary judgment motions to the extent they ask the Court to determine the appropriate remedy for Defendants' violations, without prejudice to any party seeking leave to file a case-dispositive motion on remedy sometime after the Court has an opportunity to hear the parties' views on how this matter should now proceed.

## CONCLUSION

Under the circumstances, the Court will proceed as follows.  First, the Court will grant Plaintiff's motion to dismiss Defendants' counterclaims, as the statute and regulations Defendants' challenge do not violate the First Amendment.  Second, the Court will grant Plaintiff's summary judgment motion and deny Defendants' summary judgment motion as to liability: Defendants are liable for violating the prohibition on converting campaign funds to personal use.  There are no genuine disputes of material fact relating to liability and the FEC is entitled to judgment as a matter of law.

Finally, the Court will deny both sides' motions for summary judgment to the extent they ask the Court to determine the appropriate remedy for Defendants' violations.  This denial is without prejudice to any party's opportunity to seek leave to file another case-dispositive motion on remedy.  However, before any additional motions practice, the Court will direct the parties to meet and confer and submit a joint status report with their position(s) on how this case should now proceed.

An order, consistent with the above, follows.

28