**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FEDERAL ELECTION COMMISSION, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 15-17-LPS |
| CHRISTINE O'DONNELL, *et al.*, | : | |
| Defendants. | : | |

Seth Nesin, Lisa J. Stevenson, Kevin Deeley, Harry J. Summers, Robert W. Bonham III, FEDERAL ELECTION COMMISSION, Washington, DC

    Attorneys for Plaintiff.

Stephen M. Hoersting, Chris Gober, THE GOBER GROUP PLLC, Austin, TX

    Attorneys for Defendants.

## **MEMORANDUM OPINION**

April 19, 2017
Wilmington, Delaware


**STARK, U.S. District Judge:**

This case is an enforcement action by the Federal Election Commission ("FEC" "Commission" or "Plaintiff") against Christine O'Donnell ("O'Donnell"), a candidate for the United States Senate; the Friends of Christine O'Donnell, a campaign committee supporting O'Donnell's candidacy ("Committee"); and Matthew Moran, in his official capacity as the Committee's treasurer (collectively, "Defendants").[1]  On September 21, 2016, the Court granted summary judgment, determining that Defendants unlawfully used campaign contributions to pay the rent for O'Donnell's residence.  *See Fed. Election Comm'n v. O'Donnell*, 2016 WL 5219452 (D. Del. Sept. 21, 2016).  At that time, the Court declined to determine the appropriate remedy for Defendants' violations.  *See id.* at *12-14.

Following the Court's decision on summary judgment, the parties indicated to the Court that they were engaged in negotiations in an effort to reach a settlement.  (*See* D.I. 66 at 3)  The parties subsequently participated in mediation proceedings with Chief Magistrate Judge Thynge.  (*See* D.I. 67, 68, 69)  Having failed to reach a settlement agreement, the parties submitted letter briefs to the Court addressing what remedy is appropriate for Defendants' personal-use violations.  (*See* D.I. 70, 71, 72, 73)

For the reasons stated below, the Court will order (i) O'Donnell to disgorge $5,701.85, (ii) Defendants jointly to pay a penalty of $25,000, and (iii) enjoin Defendants from converting campaign contributions to personal use.

---

[1] On March 12, 2015, Chris Marston, who replaced Moran as the Committee's treasurer, was substituted for Moran as a defendant.

**DISCUSSION**

Under the Federal Election Commission Act ("FECA"), following "a proper showing that the person involved has committed . . . a violation of this Act," a court "may grant a permanent or temporary injunction, restraining order, or other order, including a civil penalty which does not exceed the greater of [$7,500] or an amount equal to any contribution or expenditure involved in such violation." 52 U.S.C. § 30109(a)(6)(B); 11 C.F.R. § 111.24(a)(1). The Court has considerable discretion to determine the appropriate remedies for violations of the statute. *See Fed. Election Comm'n v. Craig for U.S. Senate*, 816 F.3d 829, 847 (D.C. Cir. 2016); *see also United States v. Mun. Auth. of Union Twp.*, 150 F.3d 259, 264 (3d Cir. 1998).

The Commission submits that the appropriate remedy for Defendants' conversion of campaign funds to pay for O'Donnell's personal residence is to: order O'Donnell to disgorge $5,701.85, which is an estimate of the benefit she received from her violations, plus pre-judgment interest; impose a civil penalty of $25,000, jointly payable by O'Donnell and the Committee; and enter an injunction prohibiting Defendants from converting campaign funds for personal use. Defendants do not contest that the Court may impose the Commission's proposed remedies. (*See* D.I. 73 at 1) But Defendants contend that disgorgement plus a lower civil penalty – of $11,403.70 – "would equally serve the interests of justice and deterrence." (*Id.*)

**A.     Disgorgement**

Disgorgement – a remedy within the statutory category of "other order[s]," 52 U.S.C. § 30109(a)(6)(B) – may be proper when it is "necessary to avoid the unjust enrichment" of the violator. *Fed. Election Comm'n v. Craig for U.S. Senate*, 70 F. Supp. 3d 82, 97 (D.D.C. 2014), *aff'd*, 816 F.3d 829 (D.C. Cir. 2016); *see also SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455

(3d Cir. 1997). Disgorgement is not meant to be punitive or compensatory; rather, "the primary purpose of disgorgement is . . . to deprive the wrongdoer of his ill-gotten gain." *Craig*, 816 F.3d at 847 (internal quotation marks and alteration omitted); *see also SEC v. Teo*, 746 F.3d 90, 105 (3d Cir. 2014).

Disgorgement is appropriate here. The Court previously concluded that "[e]ven assuming it could be viewed as proper for the Committee to pay the portion of the rent and facilities on the Townhouse associated with the non-personal residence parts of the Townhouse, and for O'Donnell to have to pay only the portion of the rent and facilities associated with the master bedroom and the other parts of the house which she used or had control over, the uncontested facts still establish that O'Donnell's payments to the Committee were insufficient." *O'Donnell*, 2016 WL 5219452, at *8. The Court determined that "[a] reasonable, conservative estimate of O'Donnell's fair share . . . is equal to $1,694.29 per quarter. But the undisputed evidence is that O'Donnell paid only $770 per quarter, which is far less than the value of what she obtained." *Id.* Based on these figures, the Commission calculates that O'Donnell underpaid by approximately $4,620 ($924.29 per quarter, for five quarters). (*See* D.I. 71 at 4) The Commission then estimates pre-judgment interest to be $1,081.85. (*See id.* at 4-5) Defendants do not dispute that the Commission's calculations result in a reasonable estimate of the amount O'Donnell benefitted from the personal use of campaign contributions. (*See* D.I. 73 at 2) Thus, the Court finds that disgorgement and pre-judgment interest are warranted and that $5,701.85 is a reasonable, but conservative, estimate of the amount O'Donnell benefitted from the Committee's improper payment of her residence.

The Court will order O'Donnell to disgorge these funds to the U.S. Treasury. Although

3

disgorgement to a candidate's campaign committee is sometimes appropriate, here it would not be, as "the Committee is largely inactive" and the Committee has transferred at least $142,000 to O'Donnell's own PAC. (D.I. 71 at 4; *see also* D.I. 70 at 3; *Craig*, 70 F. Supp. 3d at 101) Therefore, disgorging to the Committee would not meaningfully accomplish the goal of depriving O'Donnell of her ill-gotten gain. In such circumstances, "courts of appeals have often affirmed the propriety of directing disgorged funds to the U.S. Treasury." *Craig*, 816 F.3d at 848; *see also SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006).

    **B.**    **Civil Penalty**

Civil penalties are generally "intended to punish culpable individuals," not simply "extract compensation or restore the status quo." *Tull v. United States*, 481 U.S. 412, 422 (1987). FECA explicitly authorizes courts to impose civil penalties, not to exceed the greater of $7,500 per violation or the amount of any contribution or expenditure involved. *See* 52 U.S.C. § 30109(a)(6)(B); 11 C.F.R. § 111.24(a)(1). When determining the amount of civil penalty to impose, the Court will consider a number of factors, such as "(1) the good or bad faith of the defendants; (2) the injury to the public; (3) the defendant's ability to pay; and (4) the necessity of vindicating the authority of the responsible federal agency," *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1258 (9th Cir. 1989); *see also Craig*, 70 F. Supp. 3d at 97; *Fed. Election Comm'n v. Am. Fed'n of State, Cty. & Mun. Employees-P.E.O.P.L.E. Qualified*, 1991 WL 241892, at *2 (D.D.C. Oct. 31, 1991), as well as the penalty's deterrent effect, *see Craig*, 70 F. Supp. 3d at 99-100.

The Commission requests that the Court impose a civil penalty of $25,000. This amount, the Commission argues, is based on the full amount of FECA violations: 15 months rent and

4

utilities that were paid by the Committee, totaling $25,639.40. (*See* D.I. 71 at 2) The Commission contends that this is in the middle of the range that FECA authorizes, based on the "amount equal to any contribution or expenditure involved," 52 U.S.C. § 30109(a)(6)(B), as O'Donnell and the Committee each violated the law, and therefore could be each be assessed a penalty of $25,639.40, for a total penalty of approximately $51,000. (*See* D.I. 71 at 2)[2] Defendants counter that a penalty of $11,403.70 – twice the amount O'Donnell must disgorge – is more appropriate. (*See* D.I. 73 at 1)

The parties are in agreement that civil penalties serve an important deterrent function in the FECA context. (D.I. 70 at 2; D.I. 71 at 2) "[A] penalty would deter not only future misconduct by these defendants, but also the misappropriation of campaign funds by others." *Craig*, 70 F. Supp. 3d at 100. "Deterrence is critical because personal use of campaign funds injures those who contributed to the Committee and undermines the public's confidence in the government and campaign finance system." (D.I. 71 at 2) Thus, civil penalties play a crucial role in protecting the public interest, and remedying the injury to the public, as "there is always harm to the public when FECA is violated." *P.E.O.P.L.E. Qualified*, 1991 WL 241892, at *2.

A civil penalty here also vindicates the Commission's authority and "strengthen[s] its ability to enforce the FECA's personal use ban in the future." *Craig*, 70 F. Supp. 3d at 99. Because "conciliation is the preferred method of dispute resolution under FECA," *Fed. Election Comm'n v. Nat'l Rifle Ass'n of Am.*, 553 F. Supp. 1331, 1338 (D.D.C. 1983), the Commission's

---

[2]The Commission also suggests that each rent or utility payment constitutes a separate personal-use violation, amounting to a maximum penalty of $337,500 ($7,500 per payment, with 45 rent and utility payments total). But the Commission does not argue that a penalty of such magnitude would be necessary or appropriate here. (*See* D.I. 71 at 1)

5

authority is best vindicated by a civil penalty that is higher than what could have been obtained during conciliation.  Given that the penalty here is being assessed after full discovery and summary judgment proceedings, the Court agrees that a penalty higher than that offered during conciliation is warranted.  Defendants represent (without dispute from Plaintiff or any contrary indication in the record) that both parties' proposed penalties are higher than the penalties discussed during conciliation.  (*See* D.I. 73 at 2)  Even so, the Court agrees with the FEC that the penalty imposed must be at least in the middle of the applicable range, for otherwise "respondents in the FEC's administrative enforcement process may understand their incentives to be to settle in advance of litigation *only if* the Commission offers a civil penalty at the very low end of the range."  (D.I. 71 at 3) (emphasis added)

Defendants' ability to pay does not detract from the evidence demonstrating that a civil penalty is warranted here.  O'Donnell has waived any defense based on an inability to pay.  (*See* D.I. 56)  With respect to the Committee, it is undisputed that the Committee has only $571.96 remaining in funds.  (*See* D.I. 70 at 2; D.I. 71 at 3)  However, this appears to be largely due to the decision of the Committee to transfer at least $142,000 to O'Donnell's political action committee, ChristinePAC (*see* D.I. 70 at 3), after the administrative complaint in this case was filed – hence, after Defendants were on notice of their potential liability.  (*See* D.I. 71 at 3-4)  Additionally, the Committee remains authorized to raise funds.  (*See id.* at 3)

Finally, the Court will consider the good or bad faith of Defendants.  At summary judgment, the Court declined to determine the appropriate remedy in light of apparent factual disputes that were potentially relevant to this factor – notwithstanding the parties' mutual contention that the Court could decide the appropriate remedy on the existing record.  *See*

6

*O'Donnell*, 2016 WL 5219452, at *12-14. The parties again agree that the Court may consider the record closed and assess the remedy without further proceedings. (*See* D.I. 70 at 4; D.I. 72 at 2; D.I. 73 at 3) The Court now agrees with the parties that it has discretion to do so. *See Tull*, 481 U.S. at 426-27; *Fed. Election Comm'n. v. Toledano*, 317 F.3d 939, 951 & n.7 (9th Cir. 2002); *United States v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955, 968 (3d Cir. 1981). And the Court further finds that the best exercise of its discretion is to determine the appropriate amount of penalty without conducting further evidentiary proceedings. Hence, the Court will evaluate the good or bad faith of Defendants as best as it can in light of the present state of the record. Doing so, the Court concludes that the good faith/bad faith factor is a neutral factor in the civil penalty analysis.

The Commission asserts that Defendants acted in bad faith based on the fact that "O'Donnell continued to reside at the Townhouse financed by the Committee long after being informed that doing so was in violation of federal law." (D.I. 71 at 3) But Defendants were alerted of the possibility of a FECA violation by a reporter, not the Commission. (*See* D.I. 70 at 4) Thus, unlike other cases giving rise to findings of bad faith, *see U.S. Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 149-50 (D.D.C. 2015), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2016); *United States v. Gurley*, 235 F. Supp. 2d 797, 806, 809 (W.D. Tenn. 2002), *aff'd*, 384 F.3d 316 (6th Cir. 2004), Defendants did not knowingly or deliberately disobey orders or requests issued by the Commission or by a court.

The Commission also finds evidence of bad faith in Defendants' failure to seek an advisory opinion after the reporter contacted O'Donnell. (*See* D.I. 71 at 3) While seeking an advisory opinion may have been the most prudent course of action, Defendants' decision not to

7

do so (like their decision not to change their behavior based on a reporter's inquiry) suggest that Defendants conducted a less-than-thorough investigation. But this is largely indicative of, perhaps, negligence, rather than bad faith.

However, just as the Court is unable to find bad faith on the present record, so, too, is the Court unable to find good faith. Defendants argue that their interactions with the Commission evince their good faith. O'Donnell claims that on two occasions she spoke with Vicki Davis, an FEC campaign finance analyst, about her living arrangements, resulting in Ms. Davis approving the arrangement both times. (*See* D.I. 59 Ex. A at 48-51) O'Donnell testified that the first phone call took place before the Committee signed the lease on the Townhouse (*see id.* at 48-49) and the second call occurred after the reporter contacted O'Donnell (*see id.* at 51). The Commission contends that these conversations did not take place. *See O'Donnell*, 2016 WL 5219452, at *13. But even assuming that these phone calls did occur, the Court is not persuaded that Ms. Davis gave Defendants the advice they claim she did. Nor would it have been reasonable, under the circumstances, for Defendants to have relied on purported legal advice from Ms. Davis, had she offered it. Ms. Davis is a campaign finance analyst, not a lawyer (*see* D.I. 55 Ex. 17 at ¶ 6), and Ms. Davis and other campaign finance analysts are trained not to provide interpretive legal advice (*see id.* at ¶ 11). Members of the public seeking legal advice or guidance about FECA are routinely directed to seek such advice from the FEC's Information Division or to file a request for an advisory opinion from the Commission. (*See id.* at ¶ 6) Defendants did not pursue either option.

Defendants suggest the record contains other evidence of their good faith. For example, Defendants retained competent legal counsel during the campaign. (*See* D.I. 73 at 3) But

8

O'Donnell testified that counsel was hired in September 2010 (*see* D.I. 59 Ex. A at 86), approximately nine months after O'Donnell began using the Townhouse as her residence, *see O'Donnell*, 2016 WL 5219452, at *2. Further, Defendants, not wanting to waive attorney-client privilege, do not rely on an "advice of counsel" defense. (*See* D.I. 73 at 2-3) But without any specifics regarding what the attorney advised with respect to the residence, the mere fact that Defendants hired an attorney does not help Defendants show good faith.

Defendants also contend that the fact that O'Donnell did pay some amount for her use of the Townhouse supports a finding of good faith. (*See id.* at 4) However, as the Court has already discussed, even assuming that O'Donnell's payment of the fair-market value for her use of one bedroom and the Committee's payment of the remainder of the rent on the Townhouse would be proper, O'Donnell underpaid by a significant amount. *See O'Donnell*, 2016 WL 5219452, at *8. Moreover, the fact that she felt she needed to pay even a portion of the rent and utilities conflicts with her later explanation that the expenditures on the Townhouse were appropriate campaign expenditures as security measures. *See id.* at *9. If this is what Defendants actually believed at the time of the campaign, the logical implication would have been that O'Donnell did not need to pay any portion of the rent or utilities.[3]

In sum, the evidence presented by the parties does not strongly suggest that Defendants acted in bad faith, but neither does it strongly suggest that they acted in good faith. Accordingly, the Court will consider this factor neutral in deciding what penalty to assess.

---

[3]The timing with which this security measures explanation came up – during O'Donnell's February 3, 2016 deposition, and not during the Commission's 2010-2014 investigation, and not even in O'Donnell's 2015 answer filed in this litigation – further undermines Defendants' effort to demonstrate good faith. *See O'Donnell*, 2016 WL 5219452, at *9.

Considering all the factors, the Court finds that a civil penalty is warranted here. Each factor either supports assessing a penalty or is neutral. The Court is further persuaded that the amount of civil penalty requested by the government, $25,000, is fair and reasonable and appropriate to further the varied interests to be served by such a penalty. It is in the middle of the range of 0 to $51,000, a range established by the amount of contribution or expenditure involved, given that there are two violators (O'Donnell and the Commission). The Court's civil penalty promotes the goal of deterrence and vindicates the authority of the FEC, as it is higher than the penalties the Commission tried to obtain during conciliation. The $25,000 penalty is also not overly punitive, which would not be appropriate given the lack of a finding that Defendants acted in bad faith. Indeed, the highly ambiguous evidence as to whether Defendants acted with good faith or bad faith – and, as noted, there is substantial evidence of both, conflicting, interpretations in the record – further corroborates the appropriateness of a civil penalty in the middle of the applicable range. As requested by the Commission – and not contested by Defendants – the Court will impose the civil penalty on Defendants jointly. (*See* D.I. 72 at 1; D.I. 73 at 1)

### C. Injunction

The Commission seeks a permanent injunction to preclude Defendants from future personal-use violations. The Court agrees that an injunction is appropriate here. *See Furgatch*, 869 F.2d at 1262; *see also Craig*, 70 F. Supp. 3d at 101-102; *Fed. Election Comm'n v. Friends of Jane Harman*, 59 F. Supp. 2d 1046, 1059 (C.D. Cal. 1999). "O'Donnell has not stated that she will not run for federal office again . . . ." (D.I. 70 at 3) She also "continues to operate ChristinePAC, a political action committee." (*Id.*) Furthermore, ChristinePAC paid for her

residence in the Townhouse until 2015, suggesting some risk of future violations. (*See id.*; D.I. 71 at 5) Therefore, injunctive relief is warranted to prevent a future personal-use violation and ensure that Defendants comply with the FECA in event of another candidacy.

## CONCLUSION

For the foregoing reasons, the Court will order O'Donnell to disgorge $4,620 and $1,081.85 in pre-judgment interest. Further, the Court will order Defendants jointly to pay a penalty of $25,000 and will enter a permanent injunction to prohibit Defendants from engaging in personal-use violations. An appropriate Order follows.